[Crim. No. 35350. Second Dist., Div. Two. Apr. 17, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS LUNA FIMBRES, Defendant and Appellant.

COUNSEL

Rosana M. Selesnick, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Gary R. Hahn, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROTH, P. J.—Appellant was found guilty of assaulting a peace officer by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (b)).[1] He contends on appeal:

1.  The trial court abused its discretion by denying his motion to dismiss the entire jury panel;

2.  The voir dire of at least two of the prospective jurors should have been conducted *in camera*; and that

3.  He was deprived of his Sixth Amendment right of trial by an impartial jury.

The basis for these contentions is found, so far as the record on appeal discloses, in the following colloquy which we set forth in its entirety.

"VENTURA, CALIFORNIA; WEDNESDAY, MARCH 7, 1979; 10:30 A.M.

"(The following proceedings were held in chambers outside the presence and hearing of the jury.)

"MR. HAFFNER: Thank you, your Honor. May the record reflect that we're in chambers outside of obviously the presence of the panel and

---

[1]Appellant had been convicted previously of assault on a peace officer in the performance of his duties, in violation of Penal Code section 241 and was granted probation, which was ordered revoked upon his present conviction. He appeals from both determinations.

the potential jury, and my client's present with Deputy District Attorney present; the Court is present, of course, and the Clerk and the Court Reporter.

"Your Honor, I know the Court is upset by interruptions in the procedure and the Court likes to run an efficient Court, probably; but I really felt compelled to make these motions outside the presence of the panel and I want to make it in the most respectful and honest way possible. I challenge now the entire panel and challenge specifically Toby Clark[2] and

[2]The pertinent portions of the court's voir dire respecting Toby Clark are as follows:
"Have any of you worked as a police officer in the past or at the present?

"Do any of you have close family members, parents or children, who presently or in the past have worked as police officers?

"Do any of you have very close personal friends who are police officers? Mr. Clark, what's the circumstance?

"MR. CLARK: I have three or four officers on the Ventura Police force that are personal friends.

"TOBY CLARK,

"EXAMINATION

"BY THE COURT:
"Q. Do you go to their homes for dinner?
"A. Yeah.
"Q. Do you know them through some organization or from school?
"A. Yes, I know them through an organization called Marriage Encounter.
"Q. In this case, as I indicated, the charge is assault on a police officer. I read it in detail before.
"A. Right.
"Q. It's really more than that, but that's one of the elements, assault on a police officer while he's in the performance of his duties. Do you think the fact that you know and I assume like and are friendly with other police officers might influence your judgment in this case?
"A. Well, I think I respect—I would respect the evidence of a police officer, you know, compared to say an ordinary citizen. I'd be more prejudiced towards what they —what they were actually talking about or presenting evidence about.
"Q. Just by virtue of the fact that they had taken an oath of office or because of training or something else?
"A. Mainly because of—well, the people I do know, they are very honest and they —I don't know. When you get to know them really close, they're like everybody else. But in the performance of their duties, they do—
"Q. What kind of work do you do?
"A. I'm a printer for the County of Ventura.
"Q. Would you be more likely to believe a police officer than you would your associates at work?
"A. To the same point.
"Q. Do you feel that you understand the distinction that I was trying to make between evaluating testimony because somebody has taken an oath of office and evaluating testimony because he may have been trained in observation or in estimating distances or speed or that sort of thing?
"A. Yes, I see what you mean. No, I wouldn't let that bear on the evidence. I'd just

Greg Kajcienski,[3] and I object to the Court's manner of questioning. And I know this is rather a sensitive and I want to be very forthright and a respectful manner. I'm not even sure if the Court is aware of what it's doing.

"Your Honor, the selection of the jury is extremely critical, as the Court well knows, and as the Court also must know, too, it's very difficult for the potential jurors to answer questions in public under our American system. It's my experience as a trial juror that sometimes the juror will be forthright at the very beginning and then, sensing the nature and tone of the questioning, will shape their answers accordingly. The Court also knows that the attorneys sometimes take unfair advantages of voir dire and attempt to manipulate the jurors. So, the initial questioning by the Court is extremely important.

"I want to point out to the Court what the Court has done in these cases. Mr. Clark is extremely forthright with us. In fact, he voluntarily used the word 'prejudice.' He said he was prejudiced for police officers. I can't get any closer to that to actual cause. The Court continued to question Mr. Clark. He mentioned that three or four officers of the Ventura Police Department, they were close personal friends, met them in marriage encounter. He respects the job of the police officer. He actually used the word prejudice. And I want to point out what the Court did with Mr. Clark. The Court in effect continued questioning Mr. Clark until Mr. Clark withdrew his statement or took back his statement that he would be prejudiced in favor of police officers. The Court

---

have to take whatever the evidence was and weigh judgment on that, not because the man was a policeman or somebody else.

"Q.   Later on in the case, I will instruct the jury that in determining the credibility of a witness, that is whether you believe him or not, you may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony. And then I go ahead and I list a number of things that you may consider. You don't have to—and they're not an inclusive list, but if you were to add to that list the fact that it's a police officer, that wouldn't be fair—would not be fair to the defendant.

"A.   No, it wouldn't.

"Q.   Do you think that you could be fair to the defendant in that regard?

"A.   Oh, sure.

"THE COURT: Thank you, sir.

"       .       .       .       .       .       .       .       .       .       .       .       .

"Q.   Apart from what we talked about previously, the policemens that you had, [sic] is there anything in your background or experience that you think might cause any problem for you in this case?

"A.   No, sir."

[3]The effect of the trial court's voir dire of Greg Kajcienski, insofar as pertinent, was substantially as set out in footnote 2.

in effect was saying—well, you said something which would in effect —'I dismiss you for cause, Mr. Clark.' I believe the Court really was communicating this message and now we'll see if we can take it back. And it continued questioning Mr. Clark until finally came up the Court said, 'Well, Mr. Clark, can you distinguish between the expertise a police officer would have because of his training and experience as opposed to just his uniform?' In effect. And finally, asked Mr. Clark if he would be fair and he answered yes.

"In my opinion, no juror in the world is going to say, 'I won't be fair.' We can ask them that one question 100 times. The jury just doesn't respond in public, 'I will be unfair.' It's an extremely rare situation. So what the Court was doing was educating the rest of the panel that the Court wanted a certain answer, did not want to be faced with an admission in public that the juror couldn't be fair.

"I want to point out what the Court did to the next witness, Mr. Kajcienski, who knows one police officer and he said—by this time I was fast enough to write down exactly what he said. I think he said, 'I think I would lean towards a police officer as a witness.' The Court again continued to question Mr. Kajcienski and it seemed to me it's a clear statement at a critical state of the voir dire by a potential juror that he was prejudiced. The Court again continued to question Mr. Kajcienski until the Court elicited, 'I can be fair.'

"I want to point out we went to the other person who said also he knew the police officers—I couldn't write fast enough, your Honor —Mr. Quintana.[4] The Court went right to the issue—I'm trying to remember; I was not able to write fast enough. The Court changed the nature of it's question. 'Is there anything about knowing a police officer that would make you prejudiced?' The Court said, 'Would you be fair, Mr. Quintana?' And of course he answered yes, he could be fair.

"Jurors, in my experience, don't know the complete ground rules of the situation. They are reluctant to admit they can be unfair in public and they may not even know what unfair means. It's a legal word of art rather than a practical word. And of course, many of them are here already; they want to serve on a jury. Notice when the Court went around again and voir dired all the individual jurors, the Court came

[4]The trial court's voir dire examination of Mr. Quintana was in effect substantially as set forth in footnote 2.

back to Mr. Clark, Mr. Kajcienski again in order and said, 'Well, Mr. Kajcienski, can you be fair?' And Mr. Kajcienski voluntarily spoke up and said, 'Well, what I said about those police officers.' Okay? And the Court again asked questions until Mr.—he got an answer that Mr. Kajcienski would be fair.

"When he went to Mr. Clark, when the Court began to question Mr. Clark, the Court said something like, 'Apart from what we have talked about, your police friends, can you be fair?' As if that didn't matter.

"THE COURT: That's not what I said, Mr. Haffner.

"MR. HAFFNER: I'm sorry, I wrote this down quickly and I really don't mean to intentionally misquote the Court.

"THE COURT: I said, 'Apart from what we've talked about, are there any factors or any experiences that might cause you difficulty?'

"MR. HAFFNER: Okay. Well, when I heard it I clearly associated it with the comments of Mr. Clark about the police officers. And finally, again went right to Mr. Quintana and said, 'Could you be fair?'

"What I'm saying is, your Honor, we—the Court knows that when we have a police officer as a main witness, and when we have a police officer the charge of assaulting a police officer with force likely to commit great bodily injury and all we have is our client here, a civilian, the Court knows there's an enormous amount of prejudice in the minds of any juror. In fact, in the mind of Counsel, even. We all start with the presumption and the hope that police officers are completely straight and honest and they tell the exact truth in the matter. And here we have three jurors—at least two—who clearly expressed immediately that they're prejudiced in favor of the police and the nature and the manner in which the Court questions those jurors gave the impression, in my opinion, to the—to the entire panel and to those jurors that that—that we'd rather not hear about that or that these things aren't that important or the whole idea of the—the key is being unfair, as if the previous statements didn't really matter.

"In my opinion, the proper thing to do was when Mr. Clark and Quintana led off with those statements, that was clearly enough for cause right there. And they were as completely honest—surprisingly honest as possible, telling the Court right at the outset the key to their

feelings in this matter. I do say this with all due respect; I understand the Court has more years on the bench as I do as a trial attorney, and I imply no prejudice on the Court's part. But seated from my point of view and based on my experience as a trial juror, I feel that the entire panel has been prejudiced and that clearly those two that we mentioned before, Mr. Clark and Mr. Kajcienski, should be—I challenge them for cause and they should be clearly excused.

"THE COURT: As far as individual challenges for cause are concerned, there are times when I have simply excused jurors without giving Counsel an opportunity to question them. I've done that on hardship cases and in some cases where the jurors simply come out and say, 'Well, I couldn't be fair in this case; my son's a police officer and I just couldn't be fair.' I'm inclined to think that probably the most fair thing to do is to allow each side to question the jurors in addition to myself, and then pass on challenges for cause, rather than to do it the other way, unless the two of you agree that I can pass on it just at the time the matter comes up.

"  .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: I think you're overly concerned. In order to avoid any possibility of prejudice to the Defendant, I'm inclined to excuse Mr. Kajcienski and Mr. Clark, unless you each want an opportunity to question them further—

"MR. HAFFNER: I'll challenge them—

"THE COURT: —Before I make a ruling.

"MR. HAFFNER: I'll challenge them, your Honor, right at this state of the proceeding. The People—

"THE COURT: You don't desire to question any further?

"MR. PAVENTI: I don't desire to question.

"  .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: Well, I'm going to excuse Mr. Clark and Mr. Kajcienski, based on Mr. Haffner's challenge for cause. In order to avoid

any possibility of additional prejudice, I'll grant that each side one additional peremptory challenge for every member of the panel who indicates he has relatives or close personal friends who are police officers. So, that leaves Mr. Quintana. So now, we're up to eleven. If there are others on the panel who have close personal friends or relatives or police officers, I'll increase the number of challenges and indicate to you outside of the Courtroom.

"MR. HAFFNER:   Thank you, your Honor.

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .

THE COURT:   I might say this: I don't think that as a general manner our jurors are so susceptible to possible impressions that they might get during jury voir dire, that they are poisoned in any way. Secondly, I don't really think that questioning that went on has indicated to them that I feel they should be dishonest in their answers or influenced in their answers. And third, in the event that we get an additional juror in the box who has close personal friends or a relative as a police officer, I'll grant you an additional challenge so that you can get rid of that person and avoid the possibility that he might have received some false impression from what I say. I don't know what more I can do to assure there's no possible difficulty other than to discharge the whole panel and I just don't think that's called for.

"MR. HAFFNER:   Your Honor, with all due respect I really do believe it's called for and especially this is going to be a rather close case.

"THE COURT:   I respect your opinion, Mr. Haffner; but on this we disagree."

■   We begin with the proposition that in carrying out its duty to select a fair and impartial jury (Pen. Code, § 1078), the trial court is not only permitted but required by inquiry sufficient for the purpose to ascertain whether prospective jurors are, through the absence of bias or prejudice, capable of participating in their assigned function in such fashion as will provide the defendant the fair trial to which he is constitutionally entitled. (See *People* v. *Crowe* (1973) 8 Cal.3d 815 [106 Cal. Rptr. 369, 506 P.2d 193]; *Barton* v. *Owen* (1977) 71 Cal.App.3d 484 [139 Cal.Rptr. 494]; see also *People* v. *Compton* (1971) 6 Cal.3d 55 [98 Cal.Rptr. 217, 490 P.2d 537].) That fundamental precept, however,

does not mean that examination must cease and a venireman be discharged upon an indication in his response to questioning, however preliminary, that he may harbor attitudes or convictions which upon amplification would lead to his disqualification for cause. Rather, as in the opposite case where his initial answers might indicate freedom from such attitudes or convictions, what is necessary is an inquiry calculated in its design and broad enough in its extent to accomplish its intended object, that is, to ascertain whether one satisfies constitutional requirements having to do with jurors. Stated otherwise, the mandate of section 1078 is not ordinarily satisfied by a trial court's voir dire of prospective jurors which terminates at the first suggestion of possible disqualification of a member of the panel nor is it necessarily overreached when questioning continues beyond responses which seemingly suggest prejudice. Thus it may well be that the answer given to any particular question posed, which would taken alone tend toward those results might, when augmented by further response, clearly be seen to avoid them. Such we believe to have been the case here, and upon the record set out above we are not prepared to say there was error in the trial court's procedure.

In like manner, we reject the assertion there was any necessity that the voir dire of prospective jurors Clark and Kajcienski should have been conducted *in camera* following their respective initial expressions of potential bias. While that no doubt might have been appropriate, it was by no means required. (*People* v. *Crowe, supra*, 8 Cal.3d 815; *People* v. *Rutkowsky* (1975) 53 Cal.App.3d 1069 [126 Cal.Rptr. 104]; *People* v. *Dorsey* (1974) 43 Cal.App.3d 953 [118 Cal.Rptr. 362].)

We are satisfied that the trial court demonstrated patience and was more generous in the disposition of counsel's objections to the challenged jurors and the jury panel than the law requires.

The judgment of conviction and the order revoking appellant's probation (see fn. 1) are affirmed.

Compton, J., and Beach, J., concurred.