[No. F012153. Fifth Dist. Mar. 29, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTO SIERRA MARTINEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through V.

**COUNSEL**

Douglas C. Littlejohn and Richard G. Rumery, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi, Thomas F. Gede and William G. Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**STONE (W. A.), Acting P. J.**—Appellant, Roberto Sierra Martinez, appeals from his convictions for transportation and possession of cocaine for sale. (Health & Saf. Code, §§ 11352 and 11351.) Among his contentions, he claims the trial court permitted inappropriate discussion and comments from potential jurors during voir dire examination which prevented him from obtaining a fair and impartial jury. Similar dilemmas face trial judges frequently as they attempt to maintain control over jury selection. We hold the reviewing court, giving deference to the findings of the trial court, must examine the totality of the circumstances to determine whether a defendant has been deprived of trial by a fair and impartial jury. We reject appellant's assertion that from the facts of his case we must presume his jury was biased. We conclude nothing in the record indicates the jury eventually chosen to try appellant was not fair and impartial, and the trial court did not abuse its discretion when it denied appellant's motion to discharge the jury panel.

### DISCUSSION

### PART I

### JURY VOIR DIRE

Appellant points to several statements made by prospective jurors in response to questions asked during voir dire and claims they tainted the entire jury panel because they were inflammatory, hostile and biased against him and the criminal justice system. He claims the trial court had an obligation to guide and control voir dire discussion and, upon failing to do so, should have dismissed the entire panel as defense counsel requested.

### A. *General Principles*

A criminal defendant has the constitutional right to have a fair and impartial jury determine guilt or innocence. (U.S. Const., Amends. VII,

XIV; Cal. Const., art. I, § 16; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748].)

" 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' [Citations.]" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 283.)

The trial court has the duty to examine prospective jurors, and both counsel for the People and counsel for the defendant must be given an opportunity for reasonable examination in order to select a fair and impartial jury. (Former Code Civ. Proc., § 223, subd. (a), added by Stats. 1988, ch. 1245, § 2, repealed by Prop. 115, approved June 5, 1990.)[1] The trial judge has an obligation "to provide for a voir dire process as speedy, focused, and informative as possible" (former Code Civ. Proc., § 223, subd. (b)) and is vested with "discretion and control with respect to the form and subject matter and duration of voir dire examination." (Former Code Civ. Proc., § 223, subd. (c).) The defendant has the right to challenge for cause those jurors the defendant has determined, as a result of examination, are impliedly or actually biased (Code Civ. Proc., § 225) and to exercise peremptory challenges to eliminate those jurors the defendant believes cannot be fair or impartial (Code Civ. Proc., § 226).

■ A trial court abuses its discretion when it refuses to allow an inquiry which bears a substantial likelihood of uncovering jury bias. (*People* v. *Wells* (1983) 149 Cal.App.3d 721, 725 [197 Cal.Rptr. 163].) Trial counsel must be allowed, within reason, to effectively probe the recesses of a juror's mind in order to determine his or her real attitudes and prejudices.

B. *Trial Proceedings*

Examination of the first 12 jurors began with a reading of the charges and the customary admonition not to discuss the case or express any opinion about the matter until final submission. Following general background examination, the court asked the jurors if there was any reason they could not be fair and impartial. Receiving no response, the judge instructed on general principles of criminal law, such as the presumption of innocence, burden of proof, credibility determinations and respective roles of judge and counsel.

---

[1] The authority and discretion of the trial judge in the context of voir dire has been expanded since the time of appellant's trial. (See present Code Civ. Proc., § 223, added by Initiative Measure (Prop. 115) approved June 5, 1990.) We are not here concerned with the application of the new Code of Civil Procedure section 223.

The first round of examination by defense counsel revealed certain prospective jurors held strong opinions about persons charged with crimes, about the criminal justice system, about defendants who do not speak English, and about police officers. In appendix "A" we set out the most antagonistic of those statements. In appendix "B" we set out a portion of the examination during the first round of the prosecutor's questioning.

Defense counsel moved to have Jurors W. S., Mrs. M., Mr. G. and D. E. excused for cause. The court excused all except Mr. G. Thereafter, defense counsel challenged the entire panel.

"Ms. THOMPSON: . . . I believe after the initial voir dire, my discussions with the jury members, that the entire panel, including those in the audience, have been tainted by the disucssion [*sic*] in the courtroom. I do not believe that voir dire is going to be fruitful. I believe they were all significantly prejudiced by the people, the discussion, this morning.

"I do not believe my client's rights will be protected with this panel.

". . . . . . . . . . . . . . . . . . . .

"Ms. THOMPSON: . . . There will always be someone on the jury panel and in the box that could say something that may possibly taint certain others, but this is the first time I have ever had a certain juror lash out like Mr. [E.], and I believe the hostile nature of the members of the panel in the box has certainly created a hostile atmosphere in the entire room, in the entire panel.

"I don't see how they could not be prejudiced.

". . . . . . . . . . . . . . . . . . . .

"THE COURT: They can give correct, honest answers, and you can get a jury of 12. I think you are not going to get all the right answers. You can ask the questions."

Voir dire continued. In response to questions from the judge, Juror H. O. indicated he had family and friends in law enforcement and they expressed unfavorable opinions regarding the criminal justice system. After his exchange with counsel in the presence of all remaining prospective jurors, which we set out in appendix "C," the court excused him upon stipulation by the parties.

Juror D. B. expressed similar opinions, which we set out in appendix "D." The court excused him for cause.

During the second round of examination by defense counsel the jurors were asked if they were present during the initial discussions that morning, whether they had heard the opinions voiced by some of the jurors and whether they felt they could be fair and impartial. Several were asked if they had heard and understood the judge's instructions regarding the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. We summarize their responses as follows:

Juror R. C. stated she had no problem with the jury system. She indicated although she thought the discussion was interesting, it did not affect her opinion one way or another about sitting as a juror. She could be fair and impartial. In response to defense counsel's inquiry whether she agreed with any of the opinions expressed that morning, she stated she gave "the credit where credit is due."

Juror K. P. was asked whether she had any difficulty with the negative experience related by Mrs. M. regarding sentencing. She responded she had no idea what the sentence was in that case and indicated she understood she was not to consider what the possible sentence in the present case might be.

Juror T. C. indicated his ability to be fair and impartial had not been affected by the discussions that morning and despite what others might feel about the criminal justice system, "it is the only system we got. It has to work."

Juror T. S. indicated the discussion had not affected his ability to be fair and impartial. He explained, "Maybe those guys believe that stuff. Maybe there is some truth to what they said. We have to work with what we have. We have to work with it."

Juror M. W. indicated in response to defense counsel's questions that although she had listened to the discussion, she would be fair and impartial and would listen to the evidence and follow the law as given by the court.

C.  *Analysis*

In *People* v. *Fimbres* (1980) 104 Cal.App.3d 780 [163 Cal.Rptr. 876], during voir dire questioning by the trial judge, two potential jurors indicated they would be more likely to believe a police officer than an average citizen. Upon further questioning and explanation from the judge, both indicated they understood they were to make a credibility determination without relying upon the fact that the witness was a police officer. The defendant challenged both jurors for cause and moved to dismiss the entire jury panel. The trial court denied the motion; the appellate court affirmed:

"We begin with the proposition that in carrying out its duty to select a fair and impartial jury (Pen. Code, § 1078), the trial court is not only permitted but required by inquiry sufficient for the purpose to ascertain whether prospective jurors are, through the absence of bias or prejudice, capable of participating in their assigned function in such fashion as will provide the defendant the fair trial to which he is constitutionally entitled. [Citations.] That fundamental precept, however, does not mean that examination must cease and a venireman be discharged upon an indication in his response to questioning, however preliminary, that he may harbor attitudes or convictions which upon amplification would lead to his disqualification for cause. Rather, as in the opposite case where his initial answers might indicate freedom from such attitudes or convictions, what is necessary is an inquiry calculated in its design and broad enough in its extent to accomplish its intended object, that is, to ascertain whether one satisfies constitutional requirements having to do with jurors. Stated otherwise, the mandate of section 1078 is not ordinarily satisfied by a trial court's voir dire of prospective jurors which terminates at the first suggestion of possible disqualification of a member of the panel nor is it necessarily overreached when questioning continues beyond responses which seemingly suggest prejudice. Thus it may well be that the answer given to any particular question posed, which would taken alone tend toward those results might, when augmented by further response, clearly be seen to avoid them. Such we believe to have been the case here, and upon the record set out above we are not prepared to say there was error in the trial court's procedure." (104 Cal.App.3d at pp. 788-789.)

█ Appellant concedes *Fimbres* is "sound, based as it is on the specific facts there presented, and the specific curative measures taken by the trial court," but contends this case should be evaluated by the same standard as cases involving juror misconduct. Once juror misconduct is shown, it is presumed to be prejudicial and the prosecution has the burden of proving no prejudice actually resulted from the misconduct. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) A showing of juror misconduct raises a presumption of prejudice because it "challenges the fundamental rights to an unprejudiced jury and the fairness of the trial proceedings, . . ." (*People* v. *Brown* (1976) 61 Cal.App.3d 476, 481 [132 Cal.Rptr. 217].)

Appellant's position assumes the comments of prospective jurors are so inflammatory we must presume no unbiased and impartial jurors remained on the panel and any doubt regarding the effect of the comments must be resolved in favor of a presumption of prejudice. He relies upon language in a footnote in *People* v. *Diaz* (1984) 152 Cal.App.3d 926 [200 Cal.Rptr. 77]

which states "where there exist any doubts regarding juror impartiality, the matter must be resolved in favor of the accused." (*Id.* at p. 937, fn. 5.) The *Diaz* footnote does not support appellant's claim. It referred to situations in which juror misconduct (such as where a juror receives evidence outside of the courtroom or where it is discovered that a juror has concealed information which would have revealed bias) is shown but it is unclear whether the remaining jurors were affected by the misconduct. In such a case it is logical to require the prosecution to establish no actual prejudice occurred as a result of the misconduct.

■ Appellant cites *People* v. *Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869], and *Rousseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655], for the proposition that voir dire may not be used to prejudice the jury for or against a particular party. He contends *Williams* and *United States* v. *Dellinger* (7th Cir. 1972) 472 F.2d 340, 367 [22 A.L.R.Fed. 159], mandate the considerable discretion vested in the trial court be exercised within reasonable limits subject to the essential demands of fairness. He claims the essential demands of fairness were not met in his case and the court allowed voir dire to be used to prejudice the jury against him.

The basic principles appellant cites are beyond dispute. However, in each of those cases, the issue was whether the trial court improperly limited questioning by counsel, resulting in insufficient information about the jurors upon which the parties could challenge for cause.

Appellant does not complain, nor can he, that his counsel was not allowed to ask questions reasonably designed to discover prejudice upon which to base a challenge for cause or to exercise a peremptory challenge. To the contrary, he complains counsel discovered so much prejudice on the part of individual jurors that we must presume the remaining jurors were indoctrinated with views which are inconsistent with his right to a fair trial.

Appellant argues the trial court had an obligation to intervene at some point in order to stop the prejudicial comments from individual jurors. He cites for our guidance numerous cases from courts outside California. (*Giles* v. *State* (1984) 253 Ga. 144 [317 S.E.2d 527]; *State* v. *Mentola* (Mo.Ct.App. 1985) 691 S.W.2d 420; *State* v. *Young* (La.Ct.App. 1985) 469 So.2d 1014; *State* v. *Ferguson* (1980) 228 Kan. 522 [618 P.2d 1186]; *United States* v. *Warren* (5th Cir. 1979) 594 F.2d 1046; *State* v. *Clabourne* (1984) 142 Ariz. 335 [690 P.2d 54]; *United States* v. *Vargas-Rios* (9th Cir. 1979) 607 F.2d 831; *Harmon* v. *Anderson* (E.D.Mich. 1980) 495 F.Supp. 341; *State* v. *Williams* (Mo.Ct.App. 1981) 630 S.W.2d 117; *State* v. *Harrell* (Mo.Ct.App. 1982) 637 S.W.2d 752; *State* v. *Strong* (1963) 119 Ohio App. 31 [196 N.E.2d

801].) We have reviewed each of these authorities and find nothing in them that advances our analysis. As appellant acknowledges, in all but one of the foregoing cases (*State* v. *Strong, supra,* 196 N.E.2d 801) the trial court's exercise of discretion in denying defendant's motion to discharge the jury panel was affirmed on appeal. Appellant contends, however, because the "hostile" comments of the jurors in his case were more numerous than those in the cited cases, and because the trial court failed to inquire further or to give the jury proper guidance, we should presume all jurors were prejudiced and should have been discharged.

In order to determine whether the trial court permitted the jury panel to be exposed to views so biased and prejudiced that we must presume, absent more extensive admonition, the panel as a whole could not be fair and impartial, we must look to the totality of the circumstances surrounding jury selection. In doing so, we consider the following:

(1) Prospective jurors made many of their "hostile comments" in response to questioning by defense counsel. Defense counsel has both the right and responsibility to probe a potential juror's mind in order to determine whether that juror can be fair and impartial. Sometimes counsel hits the proverbial pay dirt. Some members of a community are of the opinion the criminal justice system does not work, believe all criminal defendants are guilty and believe law enforcement is infallible. The purpose of questioning by the court and counsel is to convince jurors to reveal their thoughts and opinions candidly. This is to the criminal defendant's advantage since jurors who reflect such attitudes can be discovered and eliminated from the process. Although the trial court has the authority and obligation to guide and control voir dire proceedings, discretion must be exercised in a manner which is not inconsistent with counsel's right to reveal the full extent of juror bias.

(2) Defense counsel questioned the remaining jurors regarding the impact of the "hostile comments." The record does not reflect the remaining jurors were affected by the opinions expressed by those jurors who had been excused. Defense counsel also questioned the remaining jurors regarding their understanding of the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. The responses do not reflect a bias or prejudice against the defendant. Appellant's contention that actual prejudice resulted from the offensive comments assumes we should ignore or discount the answers given by the remaining jurors, i.e., we should presume the responses to counsel's questions were not candid or the jurors were subconsciously and irrevocably indoctrinated by the views expressed. We decline to engage in such speculation.

(3) Despite appellant's assertion to the contrary, the trial judge did not sit idly by in the face of the opinions expressed. When Juror D. E. expressed his frustration with the criminal justice system and his belief it would be impossible to be fair with a non-English-speaking defendant, the trial judge responded, "I know you understand that a person who is charged with a crime is presumed innocent until proven guilty." He later attempted to explain the principle by way of hypothetical:

"Mr. [E.], you have made an observation. Let me make an analogy for you. If Mr. Martinez were charged with murder, everyone is against murder, but we still select fair and impartial jurors. You are against drugs. That is no big deal. Everybody is against drugs.

"You still have to hear the evidence before you make a determination of guilt or innocence."

When Juror D. R. persisted in his apparent attempts to find out whether appellant was a citizen of the United States, the trial judge instructed it was not relevant to the task before the jury. The court engaged Juror B. in a dialogue regarding the juror's understanding of the presumption of innocence and the necessity of proof beyond a reasonable doubt.

Appellant claims the judge's comments were too little and too late. The trial court might have explained why appellant's residency or citizenship was not relevant, provided the jury with a short civics lesson explaining why the criminal justice system is designed to place the burden on the prosecution, or admonished the jurors not to place any significance on what they heard from any other juror. However, we conclude the judge's failure to be more vocal did not preclude appellant from obtaining a fair and impartial jury; particularly since defense counsel questioned the remaining jurors and explained their proper role in the process.

██ Just as a finder of fact is in a better position than the reviewing court to judge the credibility of a witness, the trial judge is in a better position to gauge the level of bias and prejudice created by juror comments. Several jurors expressed biased opinions with which the remaining jurors did not agree. To the extent the remaining jurors may have found some merit in the comments, it does not appear they were unable to set aside their frustration with the system in order to judge the case against appellant fairly and impartially.

The conclusion of a trial judge on the question of individual juror bias and prejudice is entitled to great deference and is reversed on appeal only upon a clear showing of abuse of discretion. (*People* v. *Caldwell* (1980) 102

Cal.App.3d 461, 473-475 [162 Cal.Rptr. 397]; *People* v. *Earnest* (1975) 53 Cal.App.3d 734, 749-750 [126 Cal.Rptr. 107].) We adopt the same standard for claims of group bias. Upon reviewing the totality of the circumstances, the trial court did not abuse its discretion when it denied appellant's motion to dismiss the entire jury panel.

PARTS II-V*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

DISPOSITION

We affirm the judgment.

Thaxter, J., and Harris, J., concurred.

A petition for a rehearing was denied April 24, 1991, and appellant's petition for review by the Supreme Court was denied June 26, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 1456.

APPENDIX A

"Ms. THOMPSON [Defense Counsel]: . . . [¶] Ladies and gentlemen, the Court has mentioned to you this case involves narcotics. Are there any among you that feel because this is a case involving a controlled substance, to wit, cocaine, you will find it difficult to sit on this jury?

"
"[Juror Number 3] A. Well, if I look at the witnesses, I guess I think—I don't know—I don't know what to say. If it was me I would feel I was guilty, caught with a controlled substance.

"
"[D. E.], JUROR NUMBER 12: Could I add something to that?
"Q.    Yes.
"JUROR NUMBER 12: Most of us here are upstanding citizens in a country turned upside down on drugs. Our lives are all your everyday people. How are we supposed to sit and hear this thing and be fair with a guy who can't even speak English? How are we going to sit in court today and tomorrow, and I am sure this guy feels the same way.
"I take issue. This is really not a good system. I object to this. This is how they are feeling.
"THE COURT: I know you understand that a person who is charged with a crime is presumed innocent until proven guilty.
"JUROR NUMBER 12: I do, but sitting here, it is going to be hard, you know, to take the time. Already in the back of your mind—

"
"THE COURT: Mr. [E.], you have made an observation. Let me make an analogy for you. If Mr. Martinez were charged with murder, everyone is against murder, but we still select fair and impartial jurors. You are against drugs. That is no big deal. Everybody is against drugs.
"You still have to hear the evidence before you make a determination of guilt or innocence.
"MR. [E.]: I will do the best I can. I am just explaining how this guy down here feels about this, like everybody feels.
"Ms. THOMPSON: During that heated discussion on each side I believe one of the jurors said because he is here he must have done something wrong.
"[W. S.], JUROR NUMBER 2: That was me.
"Ms. THOMPSON: I thought that was you, Mr. [S.].
"Q.    Are you assuming, again, before you have the evidence before you, and knowing the defendant has entered a not guilty plea, and the jury has been brought here, do you feel his arrest is enough to show he has done something wrong?
"A.    I believe so, yes.
"Q.    As a result of that, before you are presented any testimony in the courtroom are you going into it with the belief my client must have done something wrong?
"A.    Yes.
"Q.    With that in mind, do you still feel that you can be fair and impartial and listen to all the testimony before you make a decision?
"A.    Well, I agree with the gentleman there. I don't want to come back Wednesday. I am trying to make a living.

"
"Q.    Is there something about the jury system itself you do not like?
"A.    Yes.
"Q.    What is that?
"A.    It depends on how much justice you can afford.
"Q.    Okay. So you are assuming that an individual who is charged with something who has big bucks for the expensive counsel can get justice? Is that what you are saying?
"A.    Yes, ma'am.

"Q. You would only be sitting on the jury because you are forced to?

"A. Yes, ma'am.

"Q. You do not believe in the jury system?

"A. No, ma'am, I don't.

"Q. So you are going to tell the Court you would be fair and impartial because you don't want to come back on Wednesday, is that right?

"A. I can't afford to come here playing games, keep coming back and forth. If I have to sit here, I will. Let's do it and get it over with, and on the jury system, explaining my feelings on it, as explained, I will spend time in jail probably if I don't, so—

"Q. Do you feel this whole thing of a jury trial is for naught?

"A. For what?

"Q. For no reason.

"A. Well, like I tried to explain earlier, I have friends in law enforcement. My nextdoor [sic] neighbor is in law enforcement. Before they are finished with the paperwork these guys are free. They are busting them two and three times, so am I supposed to say, yes, the jury system is wonderful? No, I am sorry. I can't. They have people being busted two or three times and they are out again. I am sorry. I can't believe in that.

". . . . . . . . . . . . . . . . . . . .

"Ms. Thompson: Q. There was an issue about my client not speaking English. You recognize my client does not speak English? All I am asking for is honest answers. You people have been honest so far.

"[D. R.], Juror Number 11: Is he a resident of Madera? Anybody know that?

"The Court: That has nothing to do with it.

"[D. R.], Juror Number 11: I want to know if he is a resident of Madera. Does he live here, in California, or what?

"The Court: That has nothing to do with it, whether he is a resident of Alaska, Hawaii or Arizona.

"[D. R.], Juror Number 11: I am not saying that. I want to find out if he is from Madera, is what I am asking.

"The Court: I don't think you will find that answer.

". . . . . . . . . . . . . . . . . . . .

"Q. Mr. [S.], would you want someone seated on the jury with your frame of mind if you were Mr. Martinez?

"A. If he is sitting there he obviously has done something wrong. If I was satisfied well, I was doing something wrong. Every speeding ticket I have got, I have deserved.

"Q. And that goes for everybody else who is charged with a violation of the law?

"A. Well, I can sit here and lie. It's up to us. I wasn't there. You can go on and on. I mean waste everybody's time. He was picked up.

"Q. You don't believe in the jury system, but you believe in the infallability [sic] of police officers?

"A. That is what we are paying them for.

"Q. We pay them to be infallable [sic]?

"A. No.

"Q. They don't make any mistakes?

"A. Not when you have authorities up there.

"Ms. Thompson: I would like a real honest answer. Is there anyone besides Mr. [S.] who feels they can be a fair and impartial juror and follow the law and make a decision based on what the Court instructs you is the law, who will say that just because they want to get their jury service done before Wednesday?

"[S. M.], Juror Number 3: It has been quite some time ago, but I sat on a case like this, and we found the person guilty, and since then what has happened to him—you come in and sit, and the jury finds him guilty, and the deicsion [sic] of the Judge is that he did not—gave him—the jury, you know, the Judge sentenced him and gave him—we found him guilty. Well, the Judge said, you know, he gave him a sentence to go to the hospital to get well.

"These are the types of things. Therefore, I really don't have much faith in setting [*sic*] on a jury. I think things like this happen. You read about it all the time."

APPENDIX  B

"MR. LICALSI [Prosecutor]: Mr. [G.], can you listen to the testimony and base your decision on that?

"A.   I can listen to the testimony and base it entirely on what I hear?

"Q.   Yes.

"A.   I am not sure I can do that.

"Q.   Can you explain what you mean?

"A.   What I am saying is, I feel there is not a shadow of—I feel like—I don't want to say that, but I think if I go in there I will have made up my mind to follow with the two gentlemen.

"Q.   Do you think you could put aside the bias you have and listen to the evidence?

"A.   I can't tell you that. I can try, but I don't know if you want to take a chance on that.

"Q.   But you are going to try?

"A.   If I have to sit here—I don't want to do it, you know—I want to do it right. I think there are plenty of people who want to sit on juries, and don't have problems they will have to be some place, but they can be a juror.

"Q.   You don't want—

"A.   I think this is the fifth time they called me. I guess I am getting tired of it.

"Q.   But you are picked?

"A.   Yes.

"Q.   And you are going to try to do your duty and listen to the testimony?

"A.   Yes.

"Q.   Mr. [E.], do you feel the same way as Mr. [G.]?

"([D. E.] nods head.)"

## APPENDIX C

"A.    Well, they catch them. They come down here. They get out. They catch them, and then, just because they do their work right, and something, some lawyer like yourself gets them off, even though they are guilty.

"Q.    Do you think it's not right that an individual, even though they are guilty, at least in the opinion of the law enforcement officer, and if they are guilty we should not protect the right of every citizen who is charged, should the police make a mistake?

"A.    Well, if I committed a crime, and I got caught redhanded, I would just plead guilty, because it is a waste of taxpayer's money.

"Q.    Let's use your example of being caught redhanded. Let's say an officer goes into your house without a search warrant, without probable cause and finds some drugs in your house.

"A.    Yes.

"Q.    You are caught redhanded, but the officer conducted an illegal search. For this officer that would be an illegal search, which could actually result in a violation of your rights, too, because if we allowed the police to do that they could come into your house.

"Do you feel it is unfair we should protect the rights of citizens?

"A.    There are constitutional rights, all right, but if you still have drugs, I would have to be wrong for having them in the first place.

"Q.    That would be if you were the only one in the house, and there was nobody else who lived there.

"You can listen to the evidence and not make—listen to the evidence that is here before you and only make a decision based on what you hear in this courtroom?

"A.    I don't really think I can do that.

"Q.    Okay. Do you feel that because Mr. Martinez is here charged with a crime and obviously has been arrested for a crime, he must have done something wrong?

"A.    He wouldn't be here if he didn't get caught doing something.

"Q.    As you can see, there are going to be a certain number of law enforcement officers that are going to testify in this proceeding. Since you do know some Sheriff's Deputies, do you believe that you might give more weight to the testimony of a law enforcement officer than to civilian testimony?

"A.    Yes.

"Q.    As you sit there now do you feel you can be a fair and impartial juror in this case?

"A.    I don't really think I can give him the benefit of the doubt."

APPENDIX D

"Q. Okay. Mr. [B.], you, as well, you said in response to a question asked by the Court if you could be fair and impartial if you had the opportunity to sit as a juror, and you said not really. Could you tell us what is giving you some concern?

"A. It's already been gone over. I think more than likely he's guilty. I know they wouldn't have brought us here without knowing they had a strong case.

"Q. Are you saying that on the basis of quality and quantity of the witnesses?

"A. I think—I am sure they know they had a strong case when they brought him here.

"Q. And also would your opinion be that they must have had some reason to arrest him, right?

"A. They must have had a good reason to bring him here.

"Q. I am talking about arresting him. Does the mere fact that an individual gets arrested for something, whatever that is, but the individual gets arrested, would you necessarily assume he must have done something wrong?

"A. Oh, no. He could have been arrested, but I mean they are not stupid enough to bring him to trial without reasonably assuming they can prosecute him.

"Q. Okay.

"Ms. Thompson: Okay.

"The Court: You understand, Mr. [B.], as I instructed you before, the defendant is presumed to be innocent—he is presumed to be innocent right now until his guilt is proved beyond a reasonable doubt?

"A. Yes.

"The Court: You wouldn't convict him without enough evidence, whatever evidence that is? You have to be convinced. You understand that?

"A. Yes.

"The Court: And you wouldn't presume he is guilty?

"A. I am not going to look at him and say he is guilty.

"The Court: You wouldn't convict him until you are convinced beyond a reasonable doubt he is guilty?

"A. Uh—

"The Court: You wouldn't want to see an innocent man convicted unless he is proved guilty beyond a reasonable doubt?

"A. No.

"The Court: You wouldn't want to see an innocent man, you yourself—you would want him to be proved guilty beyond a reasonable doubt?

"A. Yes.

"The Court: He would have to be proven guilty beyond a reasonable doubt, wouldn't he?

"A. Yes.

"The Court: If they didn't prove him guilty beyond a reasonable doubt you would acquit him, right?

"A. Yes.

"The Court: You may proceed.

"Ms. Thompson: Q. You sounded real reluctant with your yeses.

"A. Maybe we watch too much TV, but everything is connected, because it wasn't made clear."