Filed 12/16/20  P. v. Beltran CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B302561 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  TA144847) |
| v. | |
| JULIO BELTRAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Connie R. Quinones, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan J. Kline and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Appellant Julio Beltran was convicted of four sexual offenses involving a neighbor's child, Wendy Q., when she was 10 years old or younger: two counts of sexual intercourse or sodomy (Pen. Code, § 288.7, subd. (a));[1] one count of forcible lewd acts (§ 288, subd. (b)(1)); and one count of oral copulation or sexual penetration (§ 288.7, subd. (b)). The trial court sentenced appellant to 73 years in state prison. Appellant appeals from the judgment of conviction, contending the trial court erred in denying his motion to dismiss the venire after prospective jurors learned he was represented by a public defender; abused its discretion in admitting photos of the victim's wrists showing a suicide attempt; and erred in failing to give a curative admonition or grant a mistrial after a law enforcement witness, holding the hand of her young child, walked past jurors outside the courtroom. We affirm the judgment of conviction.

## BACKGROUND

When Wendy Q. was about six or seven years old, appellant's wife Elizabeth Ortiz began babysitting her. Ortiz, appellant and their children lived on Elm Street, across the street from Wendy and her family. Wendy's mother dropped her off about 7:00 a.m. and picked her up about 4:30 p.m. During the school year, Ortiz watched Wendy before school, took her to school, picked her up, and watched her until her mother came home. During the summer, Ortiz watched Wendy all day. On occasion, Ortiz watched Wendy on a Saturday.

According to Wendy, appellant was sometimes in the house while Ortiz was watching her. Ortiz would occasionally leave

---

[1] Further undesignated statutory references are to the Penal Code.

Wendy and her children with appellant while Ortiz ran errands. Wendy usually went to Ortiz's bedroom to watch her drive away. On one occasion, appellant followed her into the bedroom, and sexually assaulted her by pressing his penis into her vagina. She told him to stop but he did not. He said if she screamed he would hurt her parents. It was painful. When appellant stopped, Wendy went to the bathroom and saw a white liquid substance on her vagina, along with drops of blood.

Wendy's mother later saw the blood on Wendy's underwear, and asked her if she had fallen or someone had touched her. Wendy was scared and said nothing had happened.

When Wendy was eight years old, appellant and Ortiz moved to Cudahy. Ortiz continued to babysit Wendy for some period of time. Wendy testified that on one occasion appellant forced her to watch a pornographic video while he tried to insert his penis into her vagina. Ortiz came home and he stopped. On another occasion, appellant pulled Wendy onto his lap and she could feel his penis pressing into her thigh. She scratched his arm and he let her go. Wendy testified at trial that appellant touched her sexually a total of four times.

In 2017, Wendy eventually told her mother about appellant's sexual assaults after she viewed a religious video. She said that she could not stand it anymore and wanted to commit suicide. In October 2017, Wendy and her parents went to a Los Angeles County Sheriff's Department (LASD) station and reported the abuse.

In November 2017, Wendy was interviewed by LASD Detective Tim Abrahams. Wendy stated appellant had sexually abused her six times in the first house and once in the Cudahy

3

house.  She specifically described the three incidents set forth above in some detail.

In December 2017, Wendy was examined by sexual assault nurse examiner Malinda Wheeler.  Wheeler found clefts and transections in Wendy's vagina, which were an indication of past penetrating trauma.  Wendy's physical condition was consistent with her account of sexual abuse.

In his defense, appellant called LASD Deputy Danielle Leos, who had interviewed Wendy when she first came to the sheriff's station.  Wendy told the deputy that the abuse occurred when she was in the first grade; during the summer of 2010; between October and December 2010; and when she was eight years old.  Wendy's mother told the deputy that Wendy's behavior had changed about two years ago.  Then, during a conversation about her bad grades, Wendy stated she had been sexually abused.  She tried to commit suicide.

Appellant also called social worker Sergio Castellanos. Deputy Leos had spoken with the social worker about Wendy. Castellanos wrote in a report that Leos told him Wendy gave inconsistent accounts of her sexual abuse, stated that her abuser touched her under her clothing, and had first disclosed the abuse to her father's girlfriend from Canada.  Deputy Leos clarified at trial that these facts were from another case she was working on at the same time as Wendy's case.  Wendy never said she revealed her abuse to her father's girlfriend from Canada.

Ortiz testified on appellant's behalf that he worked full time at a Circle K convenience store when they lived on Elm Street.  His hours were 7:00 a.m. to 4:00 or 4:30 p.m.  Ortiz never left Wendy at the house while she ran errands.  Ortiz only

4

babysat Wendy for two or three months after Ortiz and her family moved to Cudahy.

Matthew Webb testified that from 2010 to 2012, appellant worked at the Circle K owned by Webb's family. His hours were 7:00 a.m. to about 4:00 p.m. on weekdays and a half day on Saturdays. Appellant was an exemplary employee and Webb could not recall a time when appellant asked to leave work early.

## DISCUSSION

1. *Appellant Was Not Prejudiced by the Disclosure That His Attorney Was a Public Defender.*

During voir dire, prospective Juror No. 6 stated he was employed by the public defender's office. In the course of questioning Juror No. 6 about his employment, the prosecutor revealed that appellant's counsel was a public defender. At a sidebar, appellant's counsel objected, noting that he had not identified himself as a public defender, and this was a matter of policy and strategy. The trial court agreed the prosecutor's disclosure was "highly inappropriate" but found appellant was not prejudiced by the revelation. The trial court questioned Juror No. 6 briefly in front of the other prospective jurors, to make clear that Juror No. 6 did not know appellant's counsel and had never interacted with him in any way whatsoever. The trial court then excused the juror. The court denied appellant's subsequent request for a curative admonition or for dismissal of the entire venire, again finding there was no prejudice to appellant.

Appellant contends the trial court violated his constitutional right to trial by a fair and impartial jury when it refused to dismiss the venire. We agree the remark was inappropriate, but see no abuse of discretion in the trial court's determination that the remark was not prejudicial.

5

Both the federal and state Constitutions guarantee a criminal defendant the right to a trial by a fair and impartial jury. (U.S. Const., 6th & 14th Amends; Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265; *People v. Martinez* (1991) 228 Cal.App.3d 1456, 1460 (*Martinez*).) The trial court is charged with examining prospective jurors to determine whether bias or prejudice exists; the prosecutor and defense counsel may also examine the jurors. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 385.)

A trial court has broad discretion to determine whether possible prejudice against a defendant has "contaminated the entire venire to such an extreme" that discharge of the venire is necessary. (*People v. Medina* (1990) 51 Cal.3d 870, 889.) A trial court's ruling on a motion to discharge the entire venire will be affirmed unless there is a clear abuse of discretion. (*Martinez*, *supra*, 228 Cal.App.3d at pp. 1466–1467.)

"[A]s a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it.' " (*People v. Medina* (1995) 11 Cal.4th 694, 741.) Appellant has not cited, and we are not aware of, any cases finding prejudice from the disclosure that a defendant was represented by a public defender.

Here, appellant's counsel objected to the disclosure of his status as a public defender primarily on the ground that it would indicate to prospective jurors that appellant was "indigent" and that studies have shown that there is an "inherent bias" against

6

indigent people.  He later added that it "infuriates" people that their taxes are paying for a defendant's attorney.  He also argued that this prejudice was exacerbated by appellant's use of a Spanish translator, which itself might cause prospective jurors to speculate that appellant was undocumented.  Appellant echoes these arguments on appeal.

There are no studies in the record showing people are inherently biased against "indigent" people, and thus no indication of what that concept means.[2]  There is also nothing to establish that people have any specific belief about how poor a criminal defendant must be before a public defender is appointed. In popular culture, criminal defendants are simply advised that if they cannot afford an attorney, one will be appointed for them. That does not imply indigence.

Even assuming for the sake of argument that some people have a bias against indigent people and believe a criminal defendant must be "indigent" if he has a public defender, the prospective jurors in this case were destined to learn of appellant's approximate level of monetary worth through the evidence in this case.  Appellant's alibi was that he worked every weekday at a Circle K convenience store.  Appellant's longtime employer testified and described him as an exemplary employee who never asked to leave early.  Thus, the evidence would show that appellant was employed fulltime and possessed a good work ethic.  On this record, there is no reasonable probability or

---

[2]     Appellant has cited a number of studies on appeal.  They are not found in the trial court record and would not be an appropriate subject of judicial notice (which in any event appellant did not seek).  We disregard those studies and argument based on them.

possibility that the disclosure that appellant had a public defender would have caused the jury to view him negatively because of his income level.

The second possible harm from the public defender disclosure was in fact identified by the trial court, who stated there is a "negative connotation that the public in general and jurors have of public defenders." The court explained: "I was a public defender. They are some of the greatest lawyers you will ever run across. Not everybody shares that view." The trial court, however, declined to dismiss the venire because "I think that you have carried yourself very well in this trial. I don't think this is going to have any negative connotation." The trial court was in the best position to observe the prospective jurors' attitudes towards appellant's counsel and to notice any change in demeanor or reaction when it was revealed he was a public defender. It was also reasonable for the court to conclude that because appellant's counsel was doing very well in the voir dire proceedings, jurors would not view him as a substandard attorney.

More broadly, the trial court had the opportunity to observe the prospective jurors' reactions a second time, when the court questioned Juror No. 6 about his work in the public defender's office and then excused him. Following that interaction, the trial court again found no prejudice to appellant. The reasonableness of the court's two determinations of no prejudice is supported by the remainder of voir dire, which continued after Juror No. 6 was excused.

Although the trial court did not question the prospective jurors about their feelings about appellant being represented by a public defender, the trial court repeatedly emphasized that jurors

should be "fair, unbiased and unprejudiced" and should base their decision on the evidence and follow the court's rulings and instructions. The court asked the jurors to disclose if they "might be bias[ed] or prejudice[d] in any way" or if they could not be "fair and impartial." The court explained that the jurors had a duty to make such disclosure "even if you are not asked . . . we expect you to tell us if it is something that is going to impact your ability to be fair and impartial." None of the prospective jurors disclosed any relevant bias or prejudice.

2.      *The Photograph of the Victim's Cut Wrists Was Never Admitted into Evidence.*

In his Opening Brief, appellant contended that the trial court abused its discretion in admitting a photograph of the victim's cut wrists. The photograph was taken by Detective Abrahams when he conducted a follow-up interview with the victim in January 2019, after learning that the victim had attempted suicide. After respondent pointed out that appellant had overlooked the trial court's subsequent ruling excluding the photograph, appellant contended that the photograph, "while not referenced further, was apparently admitted into evidence insofar as People's Exhibits 1 through 6 were moved into evidence (CT 131; RT 4:1916)." We read the record differently.

It appears that although the wrist photograph was referred to as Exhibit 4, it was never formally marked. The court's rulings concerning the photograph occurred on June 19, but the index to the reporter's transcript does not show that an Exhibit 4 was marked on that date. The index does show a photograph being marked as Exhibit 4 on June 20 at page 1835, as well as a disk being marked as Exhibit 5. The index shows both exhibits being admitted into evidence at page 1917. Page 1835 involves

9

the direct examination of Nurse Wheeler. During this examination, the prosecutor stated: "I have a single sheet of paper that's going to be People's Exhibit--." The court interjected "4." The prosecutor stated that it was a photograph, and the record shows that the paper was marked as People's Exhibit 4. The prosecutor then asked Nurse Wheeler: "And is this a picture of [the victim] on the day of your examination?" The nurse replied: "Yes." The court replied: "So the disk itself will be marked People's 5." The prosecutor repeated: "People's 5 for the disk, and 4 would be the photo." The court agreed.

Thus, it is clear that the Exhibit 4 which was admitted into evidence was a photograph of the victim during her sexual assault examination at a hospital in December 2017, not a photograph of the victim's cut wrists taken during a January 2019 police interview. The 2019 wrist photograph was not admitted at trial.

3. *Appellant Has Forfeited His Spectator Misconduct Claim.*

When Deputy Leos told the court she had childcare issues on one of the days she was scheduled to testify, the court suggested the deputy bring the child to court and have her wait in the jury room while the deputy testified. Although Deputy Leos called as a defense witness, the prosecutor agreed to provide someone to sit with the child. On June 21, Deputy Leos came to court with her three-year-old daughter, walked by five jurors sitting in the hallway outside the courtroom, and entered the courtroom. No juror saw the child after that.

Appellant contends Deputy Leos's act of walking past the jurors with her child was prejudicial spectator misconduct. He contends that at a minimum the trial court erred in failing to

10

instruct the jury not to consider the presence of the child in the hallway.

Although appellant brought the out-of-court conduct to the court's attention, he did not request a curative admonition to the jury. We question whether the described act would in any way have caused jurors to find the deputy more sympathetic or credible, or to speculate that the child with the deputy was also a victim. If so, an admonition would have been sufficient to cure any possible harm. Thus, appellant has forfeited this claim. (*People v. Trinh* (2014) 59 Cal.4th 216, 250; *People v. Chatman* (2006) 38 Cal.4th 344, 368.) Similarly, to the extent appellant contends a mistrial was warranted, he has forfeited this claim by failing to move for a mistrial. (*People v. Carrasco* (2014) 59 Cal.4th 924, 965.)

Further, even assuming for the sake of argument that the claim had not been forfeited, the jurors were instructed not to let sympathy or bias towards witnesses influence their decision. Jurors were also instructed that their verdicts "must be based only on the evidence presented during trial in this court" and they "must not allow anything that happens outside of the courtroom to affect [their] decision." Jurors are presumed to understand and follow their instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Appellant has not rebutted this presumption.

4. *There Is No Cumulative Error.*

Appellant contends that even if the errors in this case are not prejudicial when considered individually, the cumulative effect of the errors is prejudicial. We have found no errors to cumulate.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

GRIMES, J.