[No. A071221. First Dist., Div. Two. Feb. 4, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD CANNIFF MESCE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

COUNSEL

Geri Lynn Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Christopher W. Grove and Tyler R. Meade, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LAMBDEN, J.**—Defendant Richard Canniff Mesce pleaded no contest to a charge of misdemeanor assault in 1987 and was consequently convicted. Effective 1993, Penal Code section 12021, subdivision (c), made it an offense to possess any firearm within 10 years after conviction of various misdemeanor offenses, including the type of assault previously committed by defendant. In the case before us defendant was convicted of violating this statute, among others. He contends the ex post facto clauses of the federal and state Constitutions protect him from prosecution under the statute and require reversal of his conviction for its violation. We disagree because we find the statute's effect is not retroactive. In an unpublished portion of the opinion, we also reject defendant's other challenges to his conviction.

### BACKGROUND

Defendant was charged with attempted murder (Pen. Code, §§ 664, 187; except as noted, unspecified references are to the Penal Code); assault with a deadly weapon, involving personal use of a firearm (§§ 245, subd. (a)(2), 1192.7, subd. (c)(8), 12022.5), and unlawful possession of a firearm within 10 years of being convicted of a misdemeanor assault (§ 12021, subd. (c)).

The victim testified defendant fired shots at him with a revolver. The other witness testified she saw the victim running near her house while a man fired a rifle towards him. Defendant denied firing any shots and claimed to have been in a shed on his own property, at the local Coast Guard station or traveling by boat between those two locations. He also claimed on the day of the alleged shooting the victim had threatened to kill him and had, contrary to the allegations, actually fired shots at him.

The jury acquitted defendant of attempted murder but found him guilty of aggravated assault with a firearm and guilty of possession of a firearm by one previously convicted of a misdemeanor assault. The court denied probation and sentenced defendant to prison for a total term of seven years, including a two-year concurrent term for the firearms possession conviction. Defendant promptly appealed.

### DISCUSSION

### I. *The statute is not retroactive*

An ex post facto law is one which later punishes an act done before the enactment of the law. The ex post facto law and its evil twin, the bill of

attainder (legislation which purports to convict by decree and without the inconvenience of trial), have been anathema to the American legal system from its inception. Although courts traditionally refer to the ex post facto prohibition in the singular, actually two such proscriptions exist in the United States Constitution and a third in the California Constitution. (U.S. Const., art. I, § 9, cl. 3, § 10; Cal. Const., art. I, § 9.)

The effect of the ex post facto prohibition is to invalidate: "[(1)] Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. [(2)] Every law that aggravates a crime, or makes it greater than it was, when committed. [(3)] Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. [(4)] Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender." (*Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386, 390 [1 L.Ed. 648, 650], italics omitted; *Collins* v. *Youngblood* (1990) 497 U.S. 37, 42 [110 S.Ct. 2715, 2719, 111 L.Ed.2d 30].)

■ The second and third of the foregoing categories are in contention here and, taken together, pose the question whether section 12021, subdivision (c), imposes additional punishment retroactively upon the defendant for his previous misdemeanor. (See *Cummings* v. *Missouri* (1866) 71 U.S. (4 Wall.) 277, 325-326 [18 L.Ed.2d 356, 363-364], as quoted in *Weaver* v. *Graham* (1981) 450 U.S. 24, 28 [101 S.Ct. 960, 963-964, 67 L.Ed.2d 17] [holding the ex post facto clause prohibits any law which " 'imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then proscribed' "]; *Beazell* v. *Ohio* (1925) 269 U.S. 167, 169-170 [46 S.Ct. 68, 69, 70 L.Ed. 216], as quoted in *Collins* v. *Youngblood, supra*, 497 U.S. 37, 42 [110 S.Ct. 2715, 2719].)

■ In *Collins* v. *Youngblood, supra*, 497 U.S. 37, the United States Supreme Court discusses the meaning of the ex post facto clause: "Although the Latin phrase '*ex post facto*' literally encompasses any law passed 'after the fact' it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them. [Citations.]" (497 U.S. 37, 41 [110 S.Ct. 2715, 2719].) The California Supreme Court has observed there is no significant difference between the federal and state constitutional ex post facto provisions and quoted *Collins* to affirm the exclusive categories established by *Calder* v. *Bull, supra*, 3 U.S. (3 Dall.) 386, almost 200 years ago. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 295-297 [279 Cal.Rptr. 592, 807 P.2d 434].)

"Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. [Citations.] The ban also restricts governmental power by restraining arbitrary and potential vindictive legislation. [Citations.] [¶] In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it. [Citations.]" (*Weaver* v. *Graham, supra,* 450 U.S. 24, 28-29 [101 S.Ct. 960, 964], fns. omitted; see also *Pro-Family Advocates* v. *Gomez* (1996) 46 Cal.App.4th 1674, 1683 [54 Cal.Rptr.2d 600]; *People* v. *McVickers* (1992) 4 Cal.4th 81, 85 [13 Cal.Rptr.2d 850, 840 P.2d 955]; *Collins* v. *Youngblood, supra,* 497 U.S. 37, 41 [101 S.Ct. 2715, 2718-2719]; *U.S.* v. *Huss* (9th Cir. 1993) 7 F.3d 1444, 1447.)

An analogous question was posed and settled in *People* v. *Mills* (1992) 6 Cal.App.4th 1278 [8 Cal.Rptr.2d 310] (*Mills*) which upheld the 1989 amendment to section 12021, subdivision (a), which extended the previous ban of concealable firearms to make possession by a felon of any firearm a further felony. The court in *Helmer* v. *Miller* (1993) 19 Cal.App.4th 1565, 1571 [25 Cal.Rptr.2d 8], followed *Mills* and a line of older cases which upheld convictions despite similar ex post facto challenges (*People* v. *Venegas* (1970) 10 Cal.App.3d 814, 822 [89 Cal.Rptr. 103] [upholding 1965 amendments which lengthened the maximum sentence for firearm possession by a felon]; *People* v. *James* (1925) 71 Cal.App. 374, 378 [235 P. 81] (*James*) [rejecting a challenge to felon-in-possession law]; *People* v. *Camperlingo* (1924) 69 Cal.App. 466, 472 [231 P. 601] (*Camperlingo*) [same]; cf. *People* v. *McCloskey* (1926) 76 Cal.App. 227, 229-230 [244 P. 930] [rejecting argument that felon-in-possession law infringed a vested property right]; *People* v. *Smith* (1918) 36 Cal.App. 88, 90 [171 P. 696] [upholding 1917 statute which criminalized carriage of concealed weapons in urban areas]).

In *Mills,* the court affirmed the defendant's conviction for being a felon in possession of a shotgun even though at the time of his prior offense and sentencing, a convicted felon was barred only from carrying concealed firearms. The court adopted the California Supreme Court's analysis in *In re Ramirez* (1985) 39 Cal.3d 931, 936-937 [218 Cal.Rptr. 324, 705 P.2d 897] (*Ramirez*), which held a prison inmate's forfeiture of sentence credits for prison misconduct was solely the result of the later misconduct and not of the prior offense for which the sentence was being served; therefore, changes in the rules effecting such forfeitures did not violate the ex post facto clause. The *Mills* court quoted former Justice Lucas in *Ramirez* as follows: "It is true

that the 1982 amendments apply to petitioner only because he is a prisoner and that he is a prisoner only because of an act committed before the 1982 amendments. Nonetheless, the increased sanctions are imposed solely because of petitioner's prison misconduct occurring after the 1982 amendments became effective." (*Ramirez, supra,* at p. 936; quoted in *Mills, supra,* 6 Cal.App.4th 1278, 1285.)

The Supreme Court in *Ramirez* reasoned the new statute only applied to the defendant because he was a convicted felon, a status he had achieved before the statute in contention became effective. Since the new statute applied only to an event occurring after its effective date, i.e., the defendant's possession of a weapon after the statute became effective, the sanctioned event occurred after the effective date of the statute and the amendment was not retroactive. As stated by the *Mills* majority: "[T]he fact of his prior conviction only places him into a *status* which makes the new law applicable to him. The legal consequences of his past conduct were not changed—only a new law was applied to his future conduct." (6 Cal.App.4th 1278, 1286.)

We find applying section 12021, subdivision (c), to defendant did not violate constitutional ex post facto principles because defendant was convicted based on conduct occurring after the effective date of the statute.

II. *The statute does not punish the defendant for his original offense*

Similar reasoning has been applied to statutes which impose heavier punishments upon offenders who have previously violated the law.

California cases have allowed the application of enhancements punishment based on previous convictions. In *People* v. *Jackson* (1985) 37 Cal.3d 826 [210 Cal.Rptr. 623, 694 P.2d 736] (overruled on different grounds in *People* v. *Guerrero* (1988) 44 Cal.3d 343, 355-356 [243 Cal.Rptr. 688, 748 P.2d 1150]), a serious-felony enhancement was based on a prior burglary conviction occurring before the enhancement was enacted, and the court stated: "No constitutional bar prevents the application of section 667 to the later offense solely because the prior conviction which serves as a basis for the enhancement was committed before the initiative passed. In the context of habitual criminal statutes, 'increased penalties for subsequent offenses are attributable to the defendant's status as a repeat offender and arise as an incident of the subsequent offense rather than constituting a penalty for the prior offense.' [Citation.]" (*People* v. *Jackson, supra,* 37 Cal.3d at p. 833; see also *People* v. *Williams* (1983) 140 Cal.App.3d 445, 448 [189 Cal.Rptr. 497]; *People* v. *Dolliver* (1986) 181 Cal.App.3d 49, 57 [225 Cal.Rptr. 920].)

Likewise, former section 12021, subdivision (a), the amendment which was in contention in *Mills, supra,* 6 Cal.App.4th 1278, withstood an ex post facto attack in *James, supra,* 71 Cal.App. 374. The court in *James* cited *Camperlingo, supra,* 69 Cal.App. 466, in which the court upheld a felon-in-possession conviction even though the felony of which the defendant had been convicted was committed prior to the passage of the act which created the crime of felon-in-possession. The *Camperlingo* court's analysis (*id.,* at pp. 470-473) was criticized by the dissent in *Mills* for not considering cases dealing with the "increase of disabilities, burdens or penalties previously imposed on or resulting from criminal acts for which defendant was previously convicted[.]" (*Mills, supra,* 6 Cal.App.4th 1278, 1298.)

Clearly not every law which merely "disadvantages" the defendant retrospectively is an ex post facto law. The *Mills* majority did not succumb to the confusion engendered by the United States Supreme Court's use of the term "disadvantaged" in *Weaver* v. *Graham, supra,* 450 U.S. 24 as well as in two later decisions. The *Mills* dissent, however, and defendant in this case, have mistakenly contended retrospective "disadvantage," such as a limitation on the right to possess a gun, is equivalent to punishment and therefore indicative of an impermissible ex post facto law. However, the United States Supreme Court has corrected the ambiguity created by its prior references to "disadvantage" by stating: "After *Collins* [*supra,* 497 U.S. 37], the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,'. . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." (*California Dept. of Corrections* v. *Morales* (1995) 514 U.S. 499, 506-507, fn. 3 [115 S.Ct. 1597, 1602, 131 L.Ed.2d 588, 595].)

The distinction is not always made in the cases between the terms "retrospective . . . [l]ooking back on, contemplating, or directed to the past," and "retroactive . . . [i]nfluencing or applying to a period prior to enactment." (American Heritage Dict. (3d ed. 1992) pp. 1541-1542.) It is a distinction which is not merely pedantic, since it leads to a description of what is permitted in a law contended to be ex post facto: looking to the past to inform the present, and also what is prohibited: acting presently to change the past. Accordingly, the question is not whether this convicted miscreant is presently denied the advantage of armaments, but rather whether the statute aims to change the punishment for the original crime. The former inquiry leads naturally to an equal protection argument long settled by cases allowing the Legislature to limit the application of laws to a uniform class of persons such as previously convicted felons. (*People* v. *Dubose* (1974) 42 Cal.App.3d 847 [117 Cal.Rptr. 235]; *James, supra,* 71 Cal.App. 374, 378-379.) The answer to the latter question must be negative.

As pointed out by the majority in *Mills*, " '[s]ome ex post facto questions of the increased-punishment type have arisen in connection with the passage of habitual criminal laws, which imposed enhanced penalties for later offenses if the defendant has previously been convicted of one or more crimes. If the defendant commits crime A at a time when there is no habitual criminal statute, then such a statute is passed imposing increased punishment for a second offense, and then the defendant commits crime B, it is not within the ex post facto prohibition to apply the habitual criminal statute to crime B. No additional punishment is prescribed for crime A, but only for the new crime B, which was committed after the statute was passed. Similarly, it is permissible to define a crime as limited to certain conduct engaged in by persons who have heretofore been convicted of some other offense and to apply the statute to one whose earlier offense and conviction predated the enactment of this statute.' [Citation.]" (*Mills, supra,* 6 Cal.App.4th 1278, 1286, quoting 1 LaFave & Scott, Substantive Criminal Law (1986) § 2.4, p. 139.)

The *Mills* dissent assumes any *increased disability and burden*, i.e., the inability to own a firearm, is a further punishment of the defendant's prior conduct, without acknowledging the critical question of whether the statute creates a new punishment for the prior offense or, rather, prohibits to an identifiable class of persons the subsequent *conduct* of owning a gun by reason of their status as convicted offenders arguably more likely to misuse firearms. The distinction presented by a statute prohibiting such conduct by convicted offenders is the same one presented by enhancements of punishments imposed on those convicted of future and distinct offenses; in both instances the defendants have by their proven conduct separated themselves into an identifiable class to which the Legislature's police powers may apply, so long as persons similarly situated are treated equally. (See *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549] regarding equal protection.)

The instant case is not distinguishable from *Mills, supra,* 6 Cal.App.4th 1278, because there is no reasonable distinction between subdivisions (a) and (c) of section 12021 which would invalidate the reasoning of the opinion. The *Mills* court has itself so concluded in *In re Evans* (1996) 49 Cal.App.4th 1263 [57 Cal.Rptr.2d 314] (*Evans*) (conviction reversed on equal protection grounds; the court found unconstitutional the classification of those permitted relief from the operation of section 12021, subdivision (c)).

In a late-filed letter brief, defendant attempts to rely upon *Evans, supra,* 49 Cal.App.4th 1263 to contend his "inability" to petition for restoration of the

right to possess a firearm, and thereby avoid prosecution under section 12021, subdivision (c), must invalidate his conviction under said section. We first note the *Evans* court had the opportunity to invalidate the entire statute but chose instead to interpret the statute expansively. In the instant case there is no evidence of any such petition nor, in fact, any language contained in section 12021, subdivision (c)(3), which would have prevented this defendant from seeking relief by such a petition within the statutory time limits.

Accordingly, even assuming the argument to have been timely raised, which is not the case, we reject defendant's contention his conviction was void as a violation of the equal protection clause. First, there is no evidence he did petition for restoration of his right to bear arms pursuant to subdivision (c)(3) of section 12021, as did the defendant in *Evans, supra,* 49 Cal.App.4th 1263. Second, this defendant was not prevented from making such a petition under the language of subdivision (c)(3), assuming he even knew the statute and its provision for relief existed. Third, the *Evans* court correctly used the remedy of expanding the inclusionary provision of the statute permitting petition for restoration of the right to possess firearms rather than nullifying the entire statute. Defendant appears to argue but for his "prevention" from petitioning for restoration of the right to possess firearms, his right to do so would have been restored and he could not have been found in criminal violation of the statute. This is speculative at best and certainly unpersuasive.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . .

## CONCLUSION

Accordingly, having found no violation of the ex post facto provisions of the United States and California Constitutions inherent in the statute and the defendant having advanced no other tenable arguments, we affirm the judgment.

Haerle, Acting P. J., concurred.

**HODGE, J.,**† Dissenting in part.—I dissent from the affirmance of the judgment of conviction on the charge of unlawful possession of a firearm in violation of Penal Code section 12021, subdivision (c) (section 12021(c)).

---

*See footnote, *ante,* page 618.

†Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## I.

The ex post facto clause prohibits any law which punishes persons, or increases their punishment, for conduct predating its enactment. (See *Cummings* v. *Missouri* (1866) 71 U.S. (4 Wall.) 277, 325-326 [18 L.Ed. 356, 363-364], quoted in *Weaver* v. *Graham* (1981) 450 U.S. 24, 28 [101 S.Ct. 960, 963-964, 67 L.Ed.2d 17]; and see *Beazell* v. *Ohio* (1925) 269 U.S. 167, 169-170 [46 S.Ct. 68, 69, 70 L.Ed. 216], quoted in *Collins* v. *Youngblood* (1990) 497 U.S. 37, 42 [110 S.Ct. 2715, 2719, 111 L.Ed.2d 30].) Thus, no statute can be applied to a defendant if its effect on him is (1) *retrospective*, and (2) *punitive*. (*Pro-Family Advocates* v. *Gomez* (1996) 46 Cal.App.4th 1674, 1683 [54 Cal.Rptr.2d 600]; *People* v. *McVickers* (1992) 4 Cal.4th 81, 85 [13 Cal.Rptr.2d 850, 840 P.2d 955]; see *Weaver* v. *Graham, supra,* 450 U.S. 24, 31 [101 S.Ct. 960, 965-966]; *Collins* v. *Youngblood, supra,* 497 U.S. 37, 41 [110 S.Ct. 2715, 2718-2719]; *U.S.* v. *Huss* (9th Cir. 1993) 7 F.3d 1444, 1447.)

The majority holds that section 12021(c), as applied to defendant, is neither retrospective nor punitive. I disagree. The conclusion that the law is not retrospective rests entirely on nonbinding authorities which are either inapposite or which reflect a fatal logical error. The conclusion that the law is not punitive is unsound because (1) the challenged law subjects defendant to imprisonment, a forthrightly penal effect; (2) the law substantially burdens defendant by prohibiting him from engaging in otherwise lawful activities; and (3) the law lacks any bona fide purpose other than punishment. Furthermore, I question whether imposition of such consequences can ever be constitutionally predicated on a charge to which the defendant pleaded guilty, like the defendant here, with *no notice* that his plea would later disable him from possessing firearms, and would expose him to imprisonment should he do so.

## II.

The Supreme Court has declared that a law is "retrospective" for purposes of the ex post facto clause "if it 'changes the legal consequences of acts completed before its effective date.'" (*Miller* v. *Florida* (1987) 482 U.S. 423, 430 [107 S.Ct. 2446, 2451, 96 L.Ed.2d 351], quoting *Weaver* v. *Graham, supra,* 450 U.S. 24, 31 [101 S.Ct. 960, 965-966].)[1]

The law here was *explicitly* "retrospective" under any rational application of this test. It indisputably changed the legal consequences of acts completed

---

[1] The majority rejects the term "retrospective" in favor of "retroactive." The United States Supreme Court has employed the word "retrospective" in the context of the ex post facto clause for at least 83 years. (See *Bugajewitz* v. *Adams* (1913) 228 U.S. 585, 591 [33 S.Ct. 607, 608, 57 L.Ed. 978].) The word focuses quite appropriately on whether a statute *looks*

before its effective date. First it disabled defendant from engaging in otherwise lawful conduct of a type enjoyed, and indeed cherished, by many citizens.[2] Second, it imposed a prison sentence for violating that prohibition. The prohibition would not have applied, and defendant's conduct could not have been punished, but for his preenactment conduct.[3] Therefore those effects were retrospective as to him.

The majority's conclusion to the contrary rests largely on the majority opinion in *People* v. *Mills* (1992) 6 Cal.App.4th 1278 [8 Cal.Rptr.2d 310], which in turn relied upon (and declared "determinative") the Supreme Court's analysis in *In re Ramirez* (1985) 39 Cal.3d 931, 936-937 [218 Cal.Rptr. 324, 705 P.2d 897]. In truth *Ramirez* is only remotely pertinent to the validity of the statute before us. A prison inmate filed a petition challenging the application to him of a new statutory plan for the accrual and loss of sentence-reduction credits. Prison authorities had found an infraction by the petitioner and reduced his credits by 48 days. The petitioner contended that this violated the ex post facto clause, because under the rules in effect at the time of his offense he was exposed to maximum credit loss of 15 days.

The Supreme Court held that the amendments were not retrospective because they concerned only the sanctions for misconduct while in prison, i.e., after their adoption. In a passage subsequently quoted and italicized in *Mills*, the Supreme Court wrote, "It is true that the 1982 amendments apply to petitioner only because he is a prisoner and that he is a prisoner only because of an act committed before the 1982 amendments. Nonetheless, the increased sanctions are imposed solely because of petitioner's prison misconduct occurring after the 1982 amendments became effective." (*Ramirez, supra,* 39 Cal.3d at p. 936; see *People* v. *Mills, supra,* 6 Cal.App.4th at p. 1285.)

Nothing in *Ramirez* has any logical parallel in the circumstances before us. The petitioner's preenactment conduct in that case was a cause of the

---

*backwards.* If it does—as is patently the case with the statute before us—the test is met, and the statute must be held retrospective. The ex post facto analysis must then proceed to the question whether the statute's effect is punitive.

[2] At oral argument both parties became embroiled in the question whether the ability to possess firearms is a "right" or a "privilege." I see no significance in the distinction for purposes of determining the retrospectivity *vel non* of a prohibition conditioned on preenactment conduct. It is enough to say that before the prohibition was enacted, defendant was free to possess firearms, and that when the prohibition took effect this freedom was revoked *based entirely on his preenactment conduct.* Such an effect is "retrospective."

[3] I use the term "preenactment" for brevity and convenience, fully recognizing that the applicable date for most purposes is not the date of enactment, but the date on which the statute takes effect. In the present context, the distinction is factually irrelevant, and "preenactment" makes up in succinctness what it may lack in precision.

subsequent penalty (and the penalty was a consequence of the prior offense) only in a purely *factual* sense, i.e., the petitioner would not have been in prison, and would not have been subject to discipline for prison misconduct, had he not previously been sentenced to imprisonment following conviction of a felony. The relevance of the prior conviction was entirely circumstantial. Indeed, the prisoner's offense is never described; the court says only that the petitioner had been "imprisoned for a crime committed before January 1, 1983." (39 Cal.3d at p. 934.) The prisoner's offense was nothing more than a historical antecedent to his presence in the prison population. It was *legally* irrelevant to any disciplinary case against him. It follows that the effects of the amended credit forfeiture rules were not *legal* consequences of acts completed before their effective date.

The statute before us, on the other hand, *looks backwards* in a way that the amendments in *Ramirez, supra,* 39 Cal.3d 931 could not be said to do. The prior conviction here is not merely a historical precondition for the punishment now being imposed, but an explicit *element of the offense* of which he has been convicted. Moreover, nothing in *Ramirez* suggests that the challenged amendments imposed any new burden of compliance on prisoners; rather they redefined the consequences which might flow from subsequent prison misconduct. Here, the statute instantly imposed a new prohibition, legally disabling defendant from engaging in a theretofore lawful activity, and conditioning that prohibition explicitly, directly, and unconditionally on preenactment conduct.

The prior offense here was not a mere happenstance; it was *an element of the current offense.* (*People* v. *Venegas* (1970) 10 Cal.App.3d 814, 822 [89 Cal.Rptr. 103].) Therefore, unlike the warden in *Ramirez, supra,* 39 Cal.3d 931—who had no occasion to present evidence of the prisoner's preenactment offense—the prosecutor here was *compelled* to *prove* the prior offense beyond a reasonable doubt. To suggest that a statute explicitly predicating its effect on such proof is not "retrospective" offends both the plain meaning of that term and the core values reflected in the ex post facto clause.

The second major source of support for the holding in *Mills* was the general principle that ". . . a statute which increases the punishment of prior offenders is not an ex post facto law if it is applied to events occurring after its effective date." (6 Cal.App.4th at p. 1286.) This rule, however, is by its terms inapplicable to section 12021, which does *not* simply impose an "increase[d] . . . punishment [on] prior offenders," but which *creates a crime* which can *only* be committed by prior offenders. The *Mills* majority fails to distinguish between a law which imposes an *enhanced punishment* based on demonstrated recidivist tendencies and one which imposes a

*unique prohibition* on *otherwise lawful conduct*, explicitly predicated on *preenactment* conduct.

The *Mills* majority seems to say that this distinction between persons punished more severely due to prior offenses and those punished *only* because of prior offenses must be challenged, if at all, as a violation of equal protection. (6 Cal.App.4th at p. 1286.) This is a pure example of the fabled red herring. Indeed, it could be drawn across the path of *any* ex post facto challenge, however meritorious. *Every* law increasing punishment retrospectively can be conceptualized as establishing a classification (prior offenders) subjected to disparate treatment (punishment). Yet no court (before *Mills*) ever implied that an ex post facto challenge to such a law is somehow superseded by the equal protection clause. The end result of the *Mills* treatment would be to render the ex post facto clause entirely superfluous by ceding its entire domain to the equal protection clause. The law, of course, is otherwise. If a statute contains the elements of an ex post facto law, it is to that extent void (*Pro-Family Advocates* v. *Gomez, supra,* 46 Cal.App.4th 1674, 1683), regardless whether it might be supported by a state interest sufficient to defeat an equal protection challenge.

Moreover, the *Mills* majority based its rejection of the equal protection argument on the premise that the law in question "acts uniformly on all persons in the affected class." (6 Cal.App.4th at p. 1287.) This is no answer to an equal protection challenge. The gist of such a challenge is that the law unconstitutionally imposes consequences on members of the class, which consequences are not shared by others. Here the challenged law does *not* "act uniformly" on all those subject to its terms. When it takes effect, those who have not yet suffered a disqualifying conviction may avoid the burden of the law by refraining from the commission of a predicate offense. By committing such an offense, the perpetrator voluntarily assumes the risk of being prosecuted, convicted, and as a consequence, disabled from further possession of firearms. In contrast, those who have *already* suffered a qualifying conviction when the law takes effect suddenly find themselves subjected to a new and unheralded burden, the risk of which they never had the opportunity to assume, and the imposition of which they never had an opportunity to avoid. Here, defendant woke up on January 1, 1994—seven years after pleading no contest to the most innocuous form of criminal assault known to our law—suddenly burdened with a disability of which neither he nor the Legislature had any inkling when he committed the prior offense, or pleaded no contest to doing so. Such a disability was manifestly retrospective.

After *Ramirez*, the two most closely relied-upon cases in *Mills* are *People* v. *James* (1925) 71 Cal.App. 374, 378 [235 P. 81] and *People* v. *Camper-lingo* (1924) 69 Cal.App. 466, 472 [231 P. 601]. Both decisions suffer from

this same failure to distinguish between a law which prohibits certain conduct and punishes prior offenders more severely and one which prohibits conduct by, and punishes, *only* prior offenders. The distinction is critical, for the repeat-offender cases rely on a rationale which has no proper application in the present context. Their rationale is that "increased penalties for subsequent offenses are attributable to the defendant's status as a repeat offender and *arise as an incident of the subsequent offense* rather than constituting a penalty for the prior offense." (*In re Foss* (1974) 10 Cal.3d 910, 922 [112 Cal.Rptr. 649, 519 P.2d 1073], italics added; see *People* v. *Mills, supra,* 6 Cal.App.4th at p. 1287, quoting *People* v. *Jackson* (1985) 37 Cal.3d 826, 833 [210 Cal.Rptr. 623, 694 P.2d 736], overruled on other grounds in *People* v. *Guerrero* (1988) 44 Cal.3d 343, 355 [243 Cal.Rptr. 688, 748 P.2d 1150]; *Parke* v. *Raley* (1992) 506 U.S. 20, 26-27 [113 S.Ct. 517, 521-522, 121 L.Ed.2d 391]; *McDonald* v. *Massachusetts* (1901) 180 U.S. 311, 312 [21 S.Ct. 389, 390, 45 L.Ed. 542] ["The punishment is for the new crime only, but is the heavier if he is an habitual criminal."].) In other words, having committed a *second, independently defined crime,* the defendant subjects himself to the Legislature's broad power to determine the penalties for that crime; and in exercising that power, the Legislature may view recidivism as grounds to enhance the penalty for the new offense. The defendant has no cause for complaint in such a case: the prohibition itself does not single him out as a prior offender; rather, like the rest of the public, he has been, at all relevant times, on notice of the consequences for violating it; and like other members of the public, he may avoid those consequences by conforming his conduct to the general laws. That his failure to do so is not the first of its kind supports an inference, with which there can be no constitutionally grounded quarrel, that he merits a more burdensome punishment. The Legislature is entitled, in other words, to find that the classic concerns of sentencing—retribution, deterrence, and incapacitation—favor enhanced punishment for those who repeatedly violate criminal laws of general application.

This rationale appears inapplicable to a statute which by its terms makes prior conviction an essential condition of *any* punishment. In such a case it is tautological to say that the defendant possesses the "status [of] a repeat offender." He can only be considered a *repeat* offender by assuming the point in issue, i.e., that the statute under scrutiny may be constitutionally applied to him. The defendant has violated that statute, if at all, only by virtue of the former offense. The more precise and fair-minded premise is that the defendant is a *former* offender, now exposed to punishment because of conduct only made unlawful by conviction of the *former* offense. The newly threatened punishment cannot plausibly be construed as an "incident" *solely* of the subsequent conduct, for that conduct would not expose the

defendant to *any* sanction without the prior offense. In contrast to the second offense cases, the law exposes such a defendant to an immediate and unconditional burden, based entirely on the prior offense, which he did not share with the rest of the public and could not avoid by conforming his conduct to the laws generally applicable to such activities.

Indeed, a statute such as the one before us places the preenactment offender in a uniquely burdensome position. Unlike persons convicted of no prior offense, he is unable to protect his right to engage in the proscribed activity by conforming his conduct to the general requirements of the criminal law, and unlike persons convicted of disqualifying offenses after enactment of the disqualifying statute he cannot voluntarily assume the disability imposed on him. At no time can he be said to have had a meaningful opportunity to preserve or waive his freedom to engage in the activity in question. His choices are only to accept an unheralded prohibition which he never voluntarily encountered, or to disregard that prohibition and suffer punishment unique to his class.

For all these reasons, I find the central legal principle cited in *Mills, supra*, 6 Cal.App.4th 1278, *James, supra*, 71 Cal.App. 374, and *Camperlingo, supra*, 69 Cal.App. 466, insufficient to support the conclusions reached in those cases. Nor are the other cases they cite supportive of those conclusions. In *People* v. *Venegas, supra*, 10 Cal.App.3d 814, 822, the court upheld a statute which *lengthened the sentence* for firearm possession by an ex-felon. The defendant's argument appeared to be, in essence, that the *sentence* for such an offense was fixed as of the time of the prior offense, not the time of the unlawful possession. As his argument conceded, however, the prohibition itself existed at the time of his prior conviction. His possession was therefore at all times unlawful. He would seem no more entitled to cite some earlier penalty provision than would any other offender who commits a crime for which the punishment has recently been increased. Although the court cited *James* and *Camperlingo* and the second-offender rationale, the holding would appear to rest on the more basic proposition that *where conduct has been unlawful at all relevant times*, it is no violation of the ex post facto clause to increase the punishment for such conduct, provided the enactment of the increase precedes the violation of the statute.

In *People* v. *McCloskey* (1926) 76 Cal.App. 227, 229-230 [244 P. 930], the argument addressed here was not considered; rather the defendant contended that " 'one cannot lawfully be convicted of a crime for continuing to own and possess that which had lawfully become his property.' " (*Id.* at p. 229.) The court rejected this argument, noting that the statute did not fall within any of the recognized definitions of an ex post facto law.

In *People* v. *Smith* (1918) 36 Cal.App. 88, 90 [171 P. 696], the court upheld a conviction under a 1917 statute criminalizing the carriage of

concealed weapons in urban areas. The offense could be committed without a prior conviction; the only effect of such a conviction was to elevate the offense to a felony. The statute therefore resembled the one before us less than one enhancing punishment based on prior offenses.

In sum, I believe the majority in *Mills, supra,* 6 Cal.App.4th 1278 was mistaken in holding that a statute of this type is not retrospective. That case failed to recognize, and thus perpetuated, the erroneous equation in *James, supra,* 71 Cal.App. 374 and *Camperlingo, supra,* 69 Cal.App. 466 between statutes which predicate a wholly new and unique disability on preenactment conduct, and those which enhance the punishment for criminal offenses based upon the defendant's having suffered prior convictions. That critically erroneous equation has since been implicitly reiterated in two decisions, from the same district, which uncritically apply *Mills.* (*Helmer* v. *Miller* (1993) 19 Cal.App.4th 1565, 1571 [25 Cal.Rptr.2d 8]; *In re Evans* (1996) 49 Cal.App.4th 1263, 1268-1269 [57 Cal.Rptr.2d 314].) I cannot join the majority in promulgating it further.

## III.

I also disagree with the majority's conclusion that section 12021(c), as applied to defendant, is not punitive. The majority quotes language from Chief Justice Rehnquist to the effect that a measure is not "punitive" for ex post facto purposes merely because it "disadvantages" prior offenders. (*California Dept. of Corrections* v. *Morales* (1995) 514 U.S. 499, 506-507, fn. 3 [115 S.Ct. 1597, 1602, 131 L.Ed.2d 588, 595].) Yet the statute here did not merely "disadvantage" defendant; it flatly prohibited him from engaging in otherwise lawful conduct of a type enjoyed by many Americans. This prohibition was not enforced by civil or regulatory means, but by prosecution and punishment of any violation as a *felony.* There is no doubt that imprisonment constitutes "punishment" for purposes of ex post facto analysis. (*People* v. *McVickers, supra,* 4 Cal.4th 81, 85.) To belittle such a consequence as a mere "disadvantage" compromises the majority's analysis.

In considering whether a particular statutory effect is "punitive," the ultimate issues are legislative *purpose* and statutory *effect.* (*People* v. *McVickers, supra,* 4 Cal.4th 81, 87, fn. 1.) These questions require an inquiry into legislative motives. (*Ibid.* ["the government's motivation is central to the question whether the legislation is 'vindictive' or 'arbitrary' and hence must be banned"].) Thus "a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose." (*Trop* v. *Dulles* (1958) 356 U.S. 86, 96 [78 S.Ct. 590, 595, 2 L.Ed.2d 630]; *People* v. *McVickers, supra,* 4 Cal.4th 81, 85.) However, the inquiry into legislative purpose must be genuine and searching; it is not concluded by the Legislature's "mere assertion of a nonpunitive

purpose." (*People* v. *McVickers, supra,* 4 Cal.4th at p. 88; see *U.S.* v. *Huss, supra,* 7 F.3d 1444, 1447-1448 ["[A] legislature may not insulate itself from an ex post facto challenge simply by asserting that a statute's purpose is to regulate present conduct rather than punish prior conduct. The overall design and effect of the statute must bear out the non-punitive intent."]; *Pro-Family Advocates* v. *Gomez, supra,* 46 Cal.App.4th 1674, 1684, fn. 12 ["The mere assertion of a nonpunitive regulatory purpose does not end our inquiry. We must test the proffered purpose to determine if it is consistent with the regulation."].)

In conducting this inquiry we are to consider relevant factors such as " '[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .' " (*People* v. *McVickers, supra,* 4 Cal.4th at p. 85, quoting *Kennedy* v. *Mendoza-Martinez* (1963) 372 U.S. 144, 168-169 [83 S.Ct. 554, 567-568, 9 L.Ed.2d 644], fns. omitted.)

While I find several of these factors to be equivocal, the rest point toward a finding of punitive purpose: The sanction here involves an affirmative disability and restraint, i.e., a prohibition, enforced by imprisonment, on the possession of property which others may lawfully possess. It comes into play only upon a finding of scienter. (See *People* v. *Howard* (1976) 63 Cal.App.3d 249, 257 [133 Cal.Rptr. 689] [to violate section 12021, "a defendant must have knowledge of the character of the object possessed"]; *People* v. *Valencia* (1989) 214 Cal.App.3d 1410, 1416 [263 Cal.Rptr. 301] [crime of possessing sawed-off shotgun was shown if defendant "knew she had possession of the item in question"].) And even if not violated, the prohibition inflicts a significant legal injury which may be understood to exact retribution for, if not deter, offenses of the type included within its sweep.

Most significantly, however, I do not believe the prohibition on firearms possession by violators of Penal Code section 240 can be *rationally* assigned to any purpose *other* than the infliction of additional punishment upon past offenders. This follows because of the triviality of the underlying offense, its inadequacy as a predictor of future lawlessness, the completely irrational exclusion of greater, necessarily inclusive offenses, and the utterly incoherent explanation which appears in the legislative record. I find the conclusion

inescapable that the avowed purpose of the specific provision affecting defendant is inconsistent with the overall scheme of section 12021, rests on one or more misconceptions of law, and is therefore, at best, "arbitrary" as applied to defendant.

The offense of simple misdemeanor assault verges on triviality, particularly in light of the consequences imposed by section 12021(c) on its perpetrators. It is nothing more than an attempted battery—"an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240; cf. *id.*, § 242 ["A battery is any willful and unlawful use of force or violence upon the person of another."].) Despite the reference to "violent injury," such an offense need not involve any real "violence" at all. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Crimes Against the Person, § 404, pp. 466-467 ["The words 'violence' . . . and 'violent' [in these statutes] . . . have no real significance . . . . '[T]he least touching' may constitute battery . . . ."]; *People* v. *Babich* (1993) 14 Cal.App.4th 801, 809 [18 Cal.Rptr.2d 60] ["Convictions of simple assault and battery do not necessarily imply findings of violence or menace."].) Since the offense can be predicated on the least touching, or attempted touching, it does not necessarily reflect moral turpitude or a general readiness to do evil. (See *People* v. *Thomas* (1988) 206 Cal.App.3d 689, 694 [254 Cal.Rptr. 15].)

The details of defendant's particular violation of Penal Code section 240 are unknown, beyond the fact that it stemmed from an altercation in a bar. Defendant denied any recollection of the underlying events—a claim which may deserve more credence than usual, given the setting. In any event, such a conviction *could* rest on such minimally violent conduct as is described above.

Section 12021 would leverage this most innocuous of physical crimes against the person into a 10-year prohibition on the possession of firearms, with violations punishable by up to 3 years in prison. (§ 12021(c); see Pen. Code § 18.) I find this consequence to be rationally disproportionate to the predicate offense.[4]

Even if the relative inconsequentiality of simple assault were not enough by itself to establish a marked disproportion between the underlying predicate offense and the ultimate sanction, section 12021(c) irrationally includes

---

[4]I recognize that the "fit" is better than it might be given the statute's provisions for relief from the prohibition. However, I do not believe that the possibility of petitioning a court for extaordinary relief, which may be granted or denied within a very broad discretion, outweighs the hugely disproportionate penal sanctions and other considerations favoring characterization of the measure as "punitive."

that offense while excluding several neighboring offenses, most or all of which necessarily include simple assault as a lesser included offense. Section 12021(c) does *not* impose a firearms-possession disability on persons convicted of a misdemeanor assault on school or park property (Pen. Code, § 241.2), or on a custodial officer (Pen. Code, § 241.1), a juror (Pen. Code, § 241.7), a public transit employee or passenger (Pen. Code, § 241.3), or on a school district peace officer (Pen. Code, § 241.4) or employee (Pen. Code, § 241.6). Yet the statute *does* list five other offenses which appear quite near the included statutes in the code: assault on an officer or other person performing official or emergency duties (Pen. Code, § 241); battery on a peace officer, public safety provider, process server, former spouse, fiancé, fianceé, or dating partner (Pen. Code, § 243); assault with a stun gun or taser (Pen. Code, § 244.5); assault with a deadly weapon (Pen. Code, § 245); and assault on a school employee with a deadly weapon, firearm, stun gun, or taser (Pen. Code, § 245.5).

The rational explanation for the above classification is not inadvertence or incrementalism, as the majority apparently assumes, but a deliberate distinction between offenses serious enough to warrant imposition of a firearms disability and offenses lacking sufficient predictive valence for that purpose. Against this light the inclusion of simple misdemeanor assault (Pen. Code, § 240) is completely irrational and arbitrary—doubly so, considering that the omitted offenses all *necessarily include* the offense of simple assault. Thus a defendant convicted of one of these greater offenses is better off, in terms of legal ability to possess firearms, than one convicted of the lesser included offense. Indeed, a defendant in a misdemeanor prosecution under one of the omitted statutes would be well advised to think twice before permitting the jury to be instructed on the lesser included offense; a defendant who hopes to hunt ducks within the ensuing ten years might well prefer conviction of the greater offense.

But it is not merely the unfairness of such a regimen which is of concern. It is the patent irrationality of supposing that if a jury convicts the defendant of simple assault, the Legislature presumes the defendant unfit to possess firearms, but no such presumption arises if the defendant is convicted of the necessarily inclusive greater offense of simple assault on a school employee. Such a statutory scheme is manifestly arbitrary and peremptory.

Nor does anything in the legislative history shed a favorable light on this facially irrational classification scheme. On the contrary, any lingering hope for a bona fide alternative purpose is eradicated by an attempt to fathom the Legislature's reasons for including Penal Code section 240 (and its conceptual twin, Penal Code section 242) in section 12021(c).

As enacted in 1990, section 12021(c) listed 20 disqualifying misdemeanors, each of which involved violence tending to interfere with law enforcement, or the threat of such violence, or the misuse of firearms or their equivalent. (Stats. 1990, ch. 9, § 2, p. 52.)[5] The rational explanation for the inclusion of these offenses, while excluding Penal Code section 240 and the other assaultive offenses noted above, is a legislative judgment that only these 20 offenses warranted the inference of increased dangerousness which justified imposition of the disability. A legislative concern to avoid overinclusion is further suggested by the temporary inclusion, and eventual deletion, of at least one other firearms-related offense. (See Assem. Bill No. 497 (1989-1990 Reg. Sess.) as amended June 23, 1989, at p. 9 [adding Pen. Code, § 374c ("shooting a[] firearm from or upon a public road or highway")]; cf. Stats. 1990, ch. 9, § 2, p. 52 [omitting Pen. Code, § 374c].)

In 1993, the Legislature adopted Assembly Bill No. 242, one effect of which was to amend section 12021(c) to add five code sections to the list of offenses triggering the ten-year prohibition. (Stats. 1993, ch. 600, § 1.) The stated purpose of the bill was "to deter firearm possession among individuals with a record of *domestic violence*." (Sen. Floor Rep., Assem. Bill No. 242 (Aug. 31, 1993), italics added; Sen. Com. on Judiciary, Hearing on Assem. Bill No. 242 (July 13, 1993); see Assem. Com. on Public Safety, Hearing on Assem. Bill No. 242 (June 3, 1993) ["to protect victims of domestic

---

[5]The offenses included in the 1990 enactment were: carrying a deadly weapon with intent to prevent a person from testifying (Pen. Code, § 136.5, as adopted by Stats. 1982, ch. 1101, § 1, p. 4002); threatening with force or violence because of assistance in prosecution (Pen. Code, § 140); bringing a weapon into a public building or meeting (Pen. Code, § 171b); possessing a loaded firearm in a state office, the capitol grounds, or school grounds (Pen. Code, § 171c); possessing a loaded firearm in the Governor's mansion or the residence of a constitutional officer (Pen. Code, § 171d); assault on an officer or other person performing official or emergency duties (Pen. Code, § 241); battery on a peace officer, public safety provider, process server, former spouse, finance, fiancee, or dating partner (Pen. Code, § 243); assault with a stun gun or taser (Pen. Code, § 244.5); assault with a deadly weapon (Pen. Code, § 245); assault on a school employee with a deadly weapon, firearm, stun gun, or taser (Pen. Code, § 245.5); grossly negligent discharge of a firearm (Pen. Code, § 246.3); discharging a firearm at an unoccupied aircraft, motor vehicle, or dwelling house (Pen. Code, § 247); exhibiting a deadly weapon or firearm in a rude, angry, or threatening manner, or using it in a fight (Pen. Code, § 417); exhibiting a replica of a firearm in a rude, angry, or threatening manner, or using it in a fight (Pen. Code, § 417.2, as amended by Stats. 1988, ch. 1605, § 2, pp. 5820-5821); possessing a firearm on the grounds of a public educational institution (Pen. Code, § 626.9); permitting another to discharge a firearm from a vehicle (Pen. Code, § 12034, subd. (b)); discharging a firearm from a vehicle (§ 12034, subd. (d)); selling a concealable firearm to a minor (Pen. Code, § 12100, subd. (a)); possessing armor-piercing ammunition (Pen. Code, § 12320); and carrying a loaded or concealable firearm, or a deadly weapon, while participating in a strike (Pen. Code, § 12590). (§ 12021(c), as adopted by Stats. 1990, ch. 9, § 2, p. 52.)

The foregoing descriptions apply to the cited statutes as in effect in 1990. Several of the statutes have been materially altered since then. They are identified here by citing the last amending or enacting statute prior to 1990.

violence from further harm at the hand of a person who already has injured them"].)

Consistent with this overarching purpose, three of the newly added disqualifying offenses concerned domestic or relational violence. (Stats. 1993, ch. 600, § 1, citing Pen. Code, §§ 273.5 [willfully injuring spouse, cohabitant, or family member]; 273.6 [violation of order restraining domestic violence]; 646.9 [stalking].) The remaining two, however, had nothing to do with domestic violence. They were Penal Code sections 240 and 242, which respectively penalize simple misdemeanor assault and simple misdemeanor battery. These offenses are not only definitionally unrelated to domestic violence; as previously noted, they scarcely involve "violence" at all, in any but the most dilute and abstract sense. Accordingly their inclusion in Assembly Bill No. 242 is on its face somewhat curious.

The inclusion of these offenses is explained only in two materially identical reports before the Assembly Committee on Public Safety. (Assem. Com. on Public Safety, Hearing on Assem. Bill No. 242 (Apr. 20, 1993); Assem. Com. on Pub. Safety, Hearing on Assem. Bill No. 242 (June 3, 1993) (collectively Reports).)[6] The Reports state that in identifying predicate offenses, section 12021(c) as enacted in 1990 *"refers to the code sections setting forth the punishment for the crimes as opposed to the code sections defining the crimes* . . . . Last year the Sutter County District Attorney suggested referencing section[] 240 . . ., since section[] 241 [is] listed among the sections which would subject the person to the additional penalty.[7] [¶] Section 240 defines an assault. *Section 241 provides what the punishment of [sic] an assault is* . . . . The most universal practice is to charge someone with violating section[] 240 . . . . *[P]eople are never convicted [under]* . . . *section[] 241* . . . ." (Assem. Com. on Public Safety (June 3, 1993) Rep. on Assem. Bill No. 242, italics added, references to Pen. Code, §§ 242 & 243 omitted.)

This extremely perplexing exposition could be taken, at first glance, to mean that the author of the proposed "correction" believed that the Legislature originally intended to include simple misdemeanor assault in the list of predicate offenses. There is no suggestion in any of the materials provided that any legislator proposed or intended to include simple misdemeanor assault as defined in Penal Code section 240. Legislative history indicates

[6]Four and one-half months after filing its brief in this matter, respondent submitted a voluminous "legislative history" consisting of many hundreds of pages of unindexed, unauthenticated, and unintelligibly organized materials. Respondent has not drawn our attention to any part of these materials except to allude to the rationale discussed in the text, which we had already discovered through independent efforts.

[7]Apparently this same proposal had been "deleted from the bill in the Senate" during the previous legislative session. (Reports, *supra.*)

the contrary. Thus a Senate Floor Report on the 1990 amendments could only be referring to Penal Code section 241, subdivision (b) when it stated that the bill "would expand the classes of individuals so prohibited [from possessing firearms] to include misdemeanor offenders convicted of . . . assaulting a peace officer or individual involved in official duties . . . ." (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 497 (Feb. 7, 1990) p. 3.) Moreover, as previously noted, an intention to include simple assault seems irreconcilable with the Legislature's exclusion of several adjacently defined forms of assault, each more serious than, and definitionally incorporating, a simple assault. Indeed, had the Legislature not been intent on avoiding overinclusion, it could simply have stated that any person convicted of misdemeanor assault, of any kind, would be subject to the ban. Instead it specifically enumerated the forms of assault which would be included, most of them involving either a threat to law enforcement officers or processes, or the use of firearms, deadly weapons, or their equivalent.

In any event, the legislative rationale is riddled with misinformation. Each of the italicized statements is either misleading or erroneous. It is untrue that the code sections listed in the 1990 statute failed to define substantive crimes. The most that can be said in support of this statement is that the statutes concerning assaults do not separately and individually define the word "assault." No such definition is required, however, to supply a sufficient description of the conduct enjoined. The term "assault" is well understood in our law, and moreover is explicitly defined in Penal Code section 240. Both the common legal meaning and the statutory definition are implicitly incorporated in the statutes proscribing more specific forms of assault. There is no more reason for an explicit cross-reference to that definition than there is for a definition, or cross-reference to a definition, of the word "firearm." It simply was not legally necessary to *cite* section 240 in order to give effect to the citation of one or more of the statutes included in the 1990 version of the statute.

The quoted rationale suggests a particular concern with the supposed ineffectiveness of citing Penal Code section *241* without an accompanying citation to Penal Code section 240.[8] Section 241, subdivision (b) (241(b)), defines the crime of, and prescribes the punishment for, assault on a police officer or other person performing official or emergency duties.[9] The author of the proposed "correction" was apparently confused by the inclusion under

---

[8] A substantially identical situation exists with respect to misdemeanor battery, as set forth in Penal Code sections 242 and 243, subdivision (a). We will largely ignore those statutes for the sake of simplicity, but recognize that our analysis seems to apply to them with equal force.

[9] "When an assault is committed against the person of a peace officer, firefighter, emergency medical technician, mobile intensive care paramedic, lifeguard, process server, traffic

the same section number of subdivision *(a)* (§ 241(a)), which sets out the *punishment* for simple misdemeanor assault as *defined* in section 240.[10] Admittedly, the enumeration of these provisions would be more systematic if subdivisions (a) and (b) of section 241 appeared in separate sections, rather than two subdivisions of the same section. However, the intent and effect of the statutes, and the meaning of a citation to one or the other, is plain enough: Section 240 defines a simple assault. Section 241(a) prescribes the punishment for a simple assault. Section 241(b) defines *and* prescribes the punishment for simple misdemeanor assault on a peace officer.[11]

Likewise, I am more than satisfied that neither the text of the statutes nor actual usage within the judicial system furnishes any reason to suppose that, as the author of the correction claimed, "people are never convicted [under] . . . section[] 241." (Assem. Com. on Public Safety (June 3, 1993) Rep. on Assem. Bill No. 242.) A conviction of simple misdemeanor assault on a peace officer is, of logical necessity, a conviction under section 241(b). Since section 241(a) merely *prescribes the punishment* for another offense (simple misdemeanor assault), it would be nonsensical to speak of a *conviction* under section 241(a). By process of elimination, the only "conviction" which can be attributed to "241" must be a conviction of assault on a peace officer under subdivision (b). Thus, a number of published opinions speak of convictions under section 241(b) simply as convictions under "241."[12] To be

---

officer, or animal control officer engaged in the performance of his or her duties, or a physician or nurse engaged in rendering emergency medical care outside a hospital, clinic, or other health care facility, and the person committing the offense knows or reasonably should know that the victim is a peace officer, firefighter, emergency medical technician, mobile intensive care paramedic, lifeguard, process server, traffic officer, or animal control officer engaged in the performance of his or her duties, or a physician or nurse engaged in rendering emergency medical care, the assault is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in the county jail not exceeding one year, or by both the fine and imprisonment." (§ 241(b).)

[10]Section 241(a) provides, "An assault is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or by both the fine and imprisonment."

[11]The other specialized forms of assault and battery cited in the same chapter of the Penal Code follow this same pattern, declaring simply that an "assault" (or battery) under stated circumstances is punishable in a stated manner. (See Pen. Code, §§ 241.1, 241.2, 241.4, 241.6, 241.7, 243.1, 243.2, 243.3, 243.5, 243.6, 243.7, 243.8.)

[12]E.g., *In re Lynch* (1972) 8 Cal.3d 410, 431 [105 Cal.Rptr. 217, 503 P.2d 921]; *People v. Tanner* (1979) 24 Cal.3d 514, 572 [156 Cal.Rptr. 450, 596 P.2d 328] (dis. opn.); *People v. Jones* (1981) 119 Cal.App.3d 749, 755 [174 Cal.Rptr. 218]; *People v. Fimbres* (1980) 104 Cal.App.3d 780, 782, fn. 1 [163 Cal.Rptr. 876]; *People v. Martinez* (1977) 75 Cal.App.3d 859, 863 [142 Cal.Rptr. 515]; *In re Becker* (1975) 48 Cal.App.3d 288, 291 [121 Cal.Rptr. 759]; *In re Wells* (1975) 46 Cal.App.3d 592, 600 [121 Cal.Rptr. 23]; *Rose v. City of Los Angeles* (1984) 159 Cal.App.3d 883, 888 [206 Cal.Rptr. 49]; *Michael R. v. Jeffrey B.* (1984)

sure, some newer decisions tend to cite the offense specifically to section 241(b).[13] Furthermore, some older decisions cited the offense to both sections 240 and 241.[14] However, the practice of referring to a violation of section 241(b) as one simply of "241" was common in 1990, and the Legislature must be presumed to have been aware of it when it included a reference to "241" in section 12021's list of predicate offenses.

By the same token, the author of the 1993 committee report was apparently *not* aware of this practice, and erroneously asserted its nonexistence as a reason for adding Penal Code section 240 to the list. Since the added citation of that statute was completely superfluous for this purpose, and no other rational purpose appears, I conclude that the inclusion of that statute was, for purposes of ex post facto analysis, arbitrary and punitive.[15] Since I also believe section 12021(c) is retroactive as applied to defendant, I would hold that its application to him offends the ex post facto clause, and that the judgment of conviction on that count must be reversed.

## IV.

I am further concerned by the application of section 12021 to defendant because his 1987 conviction rested on a plea of no contest—an admission of criminal culpability which could not have been knowing and voluntary since it could not place him on notice that the state would, as a direct consequence of his plea, prohibit him from possessing firearms and imprison him as a felon for any violation of that prohibition. I do not believe such a result is to be tolerated in light of the rule that a defendant must be advised of the direct consequences of his or her plea at the time the plea is entered. (See *In re*

158 Cal.App.3d 1059, 1067 [205 Cal.Rptr. 312]; *Krueger* v. *City of Anaheim* (1982) 130 Cal.App.3d 166, 170, 173 [181 Cal.Rptr. 631].

[13]E.g., *People* v. *Simons* (1996) 42 Cal.App.4th 1100, 1109, fn. 5 [50 Cal.Rptr.2d 351]; *People* v. *White* (1991) 227 Cal.App.3d 886, 888 [278 Cal.Rptr. 48]; *People* v. *Delahoussaye* (1989) 213 Cal.App.3d 1, 5, 7 [261 Cal.Rptr. 287]; *People* v. *Mitchell* (1988) 199 Cal.App.3d 300, 302 [244 Cal.Rptr. 803].

[14]E.g., *In re James M.* (1973) 9 Cal.3d 517, 520 [108 Cal.Rptr. 89, 510 P.2d 33]; *Raymond B.* v. *Superior Court* (1980) 102 Cal.App.3d 372, 374 [162 Cal.Rptr. 506]; *In re Kubler* (1975) 53 Cal.App.3d 799, 802 [126 Cal.Rptr. 25]; *People* v. *Townsend* (1971) 20 Cal.App.3d 688, 691, 697 [98 Cal.Rptr. 25]; *People* v. *Booher* (1971) 18 Cal.App.3d 331, 333 [95 Cal.Rptr. 857]; *People* v. *Colbert* (1970) 6 Cal.App.3d 79, 81 [85 Cal.Rptr. 617].

[15]Furthermore, even if the peculiarities of statutory enumeration furnished a logical reason to add section 240 to the list, I would not find a bona fide alternative purpose without some additional showing that the Legislature could not achieve the same objective by more closely tailored means, e.g., renumbering the affected statutes to eliminate the perceived anomaly. I consider it inherently arbitrary to subject a large class of misdemeanants to draconian penalties simply to ensure that more serious offenders are prevented from taking cover behind infelicities in codification. Such retrospective "corrections" to poorly drawn statutes themselves provoke the core concerns of the ex post facto clause.

*Birch* (1973) 10 Cal.3d 314, 321-322 [110 Cal.Rptr. 212, 515 P.2d 12] [conviction on guilty plea to lewd conduct, based on public urination, reversed for failure to advise of sex offender registration requirement]; *People* v. *McClellan* (1993) 6 Cal.4th 367, 376 [24 Cal.Rptr.2d 739, 862 P.2d 739] [error not to advise defendant charged with sexual assault of sex offender registration requirement]; *In re Evans, supra,* 49 Cal.App.4th at p. 1269 [not reaching objection in section 12021(c) case, but assuming potential merit].)[16]

Moreover, apart from California authorities concerning the necessity of adequate advisements of the consequences of a plea, we should be concerned by the notion that the state may in 1987 receive and accept a plea necessarily premised on the consequences to be reasonably anticipated at that time—and then, years later, peremptorily change those consequences to the defendant's significant harm. In my view, the state's calculated retrospective infliction of such unpredictable consequences offends fundamental principles of fairness and therefore implicates the due process clause.

Defendant testified without contradiction that his plea of no contest had virtually *no* legal consequences at the time he entered it; there was "no fine, no sentence . . . . [n]o other admonition whatsoever." Little did he know that seven years later, his decision not to contest that charge would ripen into a felony conviction for violating a prohibition which, at the time of his offense and plea, was not even a glimmer in the legislative eye. Furthermore, the reasonably foreseeable consequences of such a plea rarely include anything approaching the magnitude and seriousness of the consequence imposed by section 12021. Defendant here testified that his 1987 plea had *no* practical immediate consequences. Yet six years later it directly and automatically operated to disable him from possessing firearms—a disability embodied in a statutory prohibition which ripened into a prison term.[17]

---

[16]A defendant waives an objection for failure to advise of the consequences of a plea by neglecting to raise the objection at the sentencing hearing. (*People* v. *McClellan, supra,* 6 Cal.4th at p. 377.) Such a waiver can hardly be found, however, where the objection *could not* have been raised at the time of the plea, as is patently the case here. (Cf. *ibid.* [error waived where defense had notice of proposed consequence and could easily have raised objection along with others at sentencing].)

[17]I note that the constitutional dubiousness of such proceedings is cast in a still darker light when the plea was entered in municipal court where, as Justice Arabian commented in *People* v. *Welch* (1993) 5 Cal.4th 228, 239 [19 Cal.Rptr.2d 520, 851 P.2d 802], ". . . defendants frequently plead guilty and receive summary probation without counsel. . . ," and the pleas entered may not always comply with due process safeguards.

If the ex post facto clause does not prohibit such a result, I would conclude that the due process clause, with its guarantee of fundamentally fair procedures, does so.[18]

I would reverse the judgment of conviction under section 12021(c).

Appellant's petition for review by the Supreme Court was denied May 14, 1997.

---

[18]This case illustrates as well as any the law of unintended consequence which applies universally to ill-conceived legislation. Penal Code section 240 traditionally has been the offense at the lowest totem of culpability, utilized conjointly by prosecutors and defenders to dispose of insignificant cases by plea when trial was not worth the effort. Police officers, not immune to indiscretions in their personal lives, have occasionally suffered convictions of section 240. Upon the enactment of section 12021(c), police and prosecuting authorities confronted the problem of their officers having become instant felons by virtue of possessing firearms in the course of their duties. Military personnel share with police the possibility of similar career-ending consequences.